Submitted September 27, 2013, reversed and remanded January 29, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SHANNON D. EGELAND,
*Defendant-Appellant.*

Grant County Circuit Court
100494CR; A148669

320 P3d 657

Peter Gartlan, Chief Defender, and Stephanie J. Hortsch, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Carson L. Whitehead, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

EGAN, J.

**EGAN, J.**

Defendant appeals a judgment of conviction for unlawful delivery of a controlled substance within 1,000 feet of a school, ORS 475.904, and one count of unlawful delivery of a controlled substance, *former* ORS 475.840(1)(c) (2009), *renumbered as* ORS 475.752(1)(c) (2011). Defendant asserts that the trial court erred by refusing to give his requested jury instruction and argues that the error was not harmless. The state concedes the error, but argues that, in light of the jury instructions that were given and the other evidence presented at trial, the error was harmless. We accept the state's concession that the trial court erred; however, we conclude that the trial court's error in refusing to give the corroboration instruction likely affected the jury's verdict. ORS 138.230. Accordingly, we reverse and remand.[1]

We review the trial court's refusal to give a requested jury instruction for errors of law. *State v. Worthington*, 251 Or App 110, 113, 282 P3d 24 (2012). In reviewing the trial court's refusal to give a requested instruction, we view the record in the light most favorable to establishment of the facts necessary to require that instruction. *State v. Black*, 208 Or App 719, 721, 145 P3d 367 (2006). In light of that standard, the facts are as follows.

Defendant had legitimate prescriptions for the pain medication Oxycontin.[2] Defendant's nurse practitioner, LM, told him that she had a patient being treated for cancer who needed assistance obtaining hydrocodone for pain relief. Defendant agreed to allow LM to prescribe hydrocodone to him, and, in turn, defendant would provide those medications to LM for that patient's use. Unbeknownst to defendant, LM, who was addicted to hydrocodone, kept the medications for her own consumption.

Defendant was charged with 21 counts of delivery of controlled substances arising over a 10-month period in

---

[1] In defendant's remaining assignments of error, defendant asserts that the trial court erred when it failed to instruct the jury that the verdict must be unanimous and imposed judgments of conviction based on a nonunanimous vote of guilty. We reject those assignments of error without further discussion. *State v. Bowen*, 215 Or App 199, 168 P3d 1208 (2007), *rev den*, 345 Or 415, *cert den*, 558 US 52 (2009).

[2] Oxycontin is the brand name for the drug oxycodone.

2009. Ten of the charges were dismissed because they related to defendant's legitimate prescription for Oxycontin. Defendant went to trial on the remaining charges relating to delivery of hydrocodone.

At defendant's trial, LM testified that she had prescribed hydrocodone to defendant between 2007 and late 2009. According to LM, she would perform medical services for defendant in exchange for hydrocodone. LM also testified about two specific instances in which she had allegedly received the prescription pills from defendant: once at a school book fair in September or October 2009 and again at a school volleyball game in October or November of 2009. LM stated that she had told defendant that she had lied about the cancer patient and disclosed her hydrocodone addiction to him in approximately September 2009. At that point, according to LM, defendant had agreed to continue to supply LM with pills to try to gradually wean her off of them.

During the testimony of the investigating officer, McKinley, the state played a tape recording of a telephone call between defendant and McKinley that occurred in mid-February 2010. In it, defendant stated that he and LM had never exchanged medical services for drugs. McKinley told defendant that his medical records were missing from LM's office and inquired several times as to whether he and LM had ever exchanged medical services for drugs. The two had the following exchange:

"MCKINLEY: How much do you think you've paid in the last year and a half?

"DEFENDANT: Uh, I haven't paid her anything.

"MCKINLEY: Well, I mean, paid for pills and then she reimbursed you.

"DEFENDANT: Oh, I'd imagine it was probably several thousand dollars.

"MCKINLEY: Okay. And I guess the reason I keep poking around the . . . If she was doing this in exchange for medical practices, uh, it just shows whether she's lying to me or not, too. 'Cause then she sent you a bill, I just find that amazing she sent you a bill, after what all I was told."

Defendant told McKinley that he would purchase the drugs and deliver them to LM, usually once a month, but sometimes more often, and LM would reimburse him with cash. McKinley asked defendant, "When did you quit paying for [the drugs]?" Defendant responded, "Um, probably the last, probably the last year and a half." He told McKinley that LM had never told him about her drug addiction. Defendant stated that he would not deliver the pills to LM's office, but would arrange with LM to meet at different locations or drop them in her mailbox. McKinley and defendant then had the following exchange:

"MCKINLEY: Would she ever do any, um, medical procedures for you in exchange for the pills?

"DEFENDANT: No. Nope. Never did that. Never, uh, . . . I never gave her pills up at the office, uh, or anything like that. She's done stuff on me, you know, for, uh . . . removed some moles and some tumor things, you know, but never, um . . . nothing like that.

"MCKINLEY: Okay.

"DEFENDANT: It was all just straight exchange.

"MCKINLEY: But never at the office?

"DEFENDANT: No, I'd um . . . no, I'd meet her at * * * her house or she'd meet me at Chester's or something like that, you know, as I was coming through.

"MCKINLEY: Okay.

"DEFENDANT: I mean, I came through there and went to her office, you know, and had stuff done * * * as I was coming through, but she wouldn't, um, have me give her pills at the office, or you know . . .

"MCKINLEY: Okay.

"DEFENDANT: I met her at [the school] one time when I came through late at night, she was up there for a volleyball game.

"MCKINLEY: So it was just wherever you happened to run into each other, it sounds like?

"DEFENDANT: Yeah, it would just be, you know . . . [inaudible] a lot of time my schedule would change, so I came through at midnight, so I'd put them in her mailbox."

McKinley asked defendant to tell him the last time that he had delivered pills to LM. Defendant responded, "[P]robably right at the end of November, first of December."

Defendant then testified that he had delivered the medications to LM in 2007 but not in 2008 or 2009. According to defendant, he had met LM at the school on one occasion, but that, contrary to LM's testimony, he had met her in the parking lot of the school to receive results from a cancer test. Defendant stated that he had planned to meet LM at her office to hear the results, but they later decided to meet at the school. According to defendant, he had never exchanged the drugs for medical services, and instead, testified that he had paid out of pocket for his medical procedures, but his medical records had "gone missing" from LM's office. Defendant testified that LM had disclosed her addiction to him in late 2009, but he did not provide her with any hydrocodone after the initial period of a few months in 2007. Instead, defendant stated that when LM spoke with him about her addiction, he had offered her advice on how to taper off of the medications.

Defendant's girlfriend also testified. She stated that she had accompanied defendant to the school parking lot to receive the results of the cancer test and had overheard the entire conversation between LM and defendant; she testified that drugs were not exchanged during that encounter. She also testified that she had never been to a book fair at the school.

At the close of testimony, defendant requested that the trial court give multiple instructions regarding accomplice-witness testimony. The trial court instructed the jury about the definition of an accomplice witness, and the definition of aiding and abetting. It also informed the jury that defendant had the burden to prove that LM was an accomplice witness, and if the jury found LM to be an accomplice, then her testimony should be viewed with distrust. The trial court, however, declined to give defendant's requested "corroboration" instruction, Uniform Criminal Jury Instruction (UCrJI) 1056, which states:

"The testimony of an accomplice in and of itself is not sufficient to support a conviction. There must be in addition

some evidence other than the testimony of an accomplice that tends to connect the defendant with the commission of the crime.

"This other evidence, or corroboration, need not be sufficient by itself to support a conviction but it must tend to show something more than just that a crime was committed. It must also connect or tend to connect the defendant with the commission of the crime."

Defendant objected to the court's refusal to give the instruction, arguing that "[t]he question of corroboration[,] I think[,] is a jury issue." As support for its decision that defendant was not entitled to that instruction, the trial court stated, "This case has plenty on corroboration. Quite frankly, the audio tape of [defendant]'s own statements certainly is corroboration. This is not a case that relies solely on an accomplice's testimony, so that's the court's ruling there."

The jury found defendant guilty of three of the 11 counts submitted to the jury: delivery of a controlled substance in September 2009, delivery of a controlled substance within 1,000 feet of a school in September 2009, and delivery of a controlled substance in November 2009.[3]

On appeal, defendant argues that the trial court erred in refusing to give UCrJI 1056. The state concedes that the trial court's refusal was error, but argues that the error was harmless. We agree and accept the state's concession that refusal to give the instruction was error; however, after reviewing the pertinent law, we conclude that the error was not harmless.

In assessing whether a trial court's erroneous refusal to give a requested jury instruction is harmless, we look to whether the error "likely affected the outcome of the case" and also to whether the lack of the jury instruction "'created an erroneous impression of the law in the minds of the [jurors] which affected the outcome of the case.'" *Hutcheson v. City of Keizer*, 169 Or App 510, 528, 8 P3d 1010 (2000) (quoting *Waterway Terminals v. P. S. Lord*, 256 Or 361, 370, 474 P2d 309 (1970)).

---

[3] The court merged the two counts relating to September 2009.

ORS 136.440(1) provides:

"A conviction cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence that tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances of the commission."

We have held that,

"[i]f any [corroborating] evidence exists, however slight or circumstantial, tending to connect the defendant with the crime other than the testimony of the accomplice, the question *whether the accomplice's testimony is so corroborated* as to establish the defendant's guilt beyond a reasonable doubt *is one for the trier of fact.*"

*State v. Ortiz-Rodriguez*, 229 Or App 373, 380, 211 P3d 373 (2009) (emphasis added) (citing *State v. Long et al.*, 113 Or 309, 312, 231 P 963 (1925)).

The state first contends that the error was harmless based on the subject matter of the jury instructions given by the trial court. *See State v. Montez*, 324 Or 343, 362, 927 P2d 64 (1996) ("It is not error for a trial court to refuse to give a requested instruction if the instruction given by the court adequately addresses the subject of the requested instruction.") However, after reviewing the instructions given by the trial court, we conclude that the subject of the requested instruction was not adequately addressed by the instructions given by the trial court.

The state next argues that, because the jury convicted defendant, it must have accepted defendant's out-of-court statements to McKinley as true and rejected defendant's trial testimony. In other words, the state contends that the jury must have concluded that LM's testimony was corroborated by defendant's out-of-court statements, thus rendering the trial court's error harmless. The state argues that it was "improbable" that the jury relied solely on LM's testimony.

We are unable to readily discern that the jury did not rely solely on LM's testimony to convict defendant. We generally assume that jurors follow instructions, unless

there is an "'overwhelming probability that they would be unable to do so.'" *State v. Tidwell*, 259 Or App 152, 156, 313 P3d 345 (2013) (quoting *State v. Smith*, 310 Or 1, 26, 791 P2d 836 (1990)). Had the jury been instructed correctly, it would have had to determine that LM's testimony was sufficiently corroborated before it could convict defendant based on any of that testimony. However, in the absence of the instruction, it is just as likely that the jury did not determine whether LM's testimony was sufficiently corroborated before relying on it to convict defendant. Although the jury may have accepted defendant's out-of-court statements to McKinley as true, it is equally possible that the jury relied only on LM's testimony. Because we cannot say on this record that the jury did the former, we cannot conclude on that basis that the trial court's failure to give the instruction was harmless.

Nonetheless, the state argues that, in light of the "substantial corroborating evidence presented at trial," the trial court's error was harmless. Not surprisingly, the state characterizes the corroboration requirement in a way that minimizes its importance, stating that the standard under the corroboration statute "is a modest one" and that the trial court's refusal to give the requested instruction did not affect the verdict because LM's testimony *was* corroborated. Defendant counters that the corroboration requirement is a demanding standard, arguing that the jury's verdict was affected because, without the requested instruction, the jury was not aware of the additional "stringency necessary to sustain" his conviction. We agree with defendant that the corroboration requirement is not so modest as to essentially discharge the jury's duty to determine *if* the evidence was sufficiently corroborated in a case with significant factual disputes.

For example, in *Black*, 208 Or App at 719, the defendant had assigned error to the trial court's refusal to instruct the jury that two of the witnesses were the defendant's accomplices. The defendant was charged with theft in the first degree. At the defendant's trial, the first witness, Carleton, testified that she had heard and observed the defendant commit the theft. The second witness, Murray, testified that, while she did not see anyone steal anything, she

recognized the items being unloaded at her house as stolen. Further, Flemming, who did not testify, had implicated the defendant in the theft before trial. We concluded that it was error for the trial court to refuse to give the requested instructions. Nevertheless, the error was harmless. We reasoned as follows:

> "The effect of refusing the requested instruction with respect to Carleton and Murray was that the jury was not told that it could not convict on the basis of their testimony unless that testimony was corroborated and that it should view their testimony with distrust. However, their testimony *was* corroborated—by Flemming's statements introduced by the state without objection."

*Id.* at 725 (emphasis in original). Thus, after examining the evidence presented at the trial to determine if there was little likelihood that giving the requested instruction would have resulted in a different verdict, we concluded that it would not because the two witnesses' testimony was cumulative of Flemming's uncontroverted statements implicating the defendant.

In contrast, where the evidence presented at trial consists solely of testimony by an accomplice that tends to connect the defendant with *an* offense, as opposed to the specific charges at issue, we have held that such evidence does not satisfy the corroboration requirement. *Ortiz-Rodriguez,* 229 Or App at 380. In that case, the defendant had been convicted of 15 counts of unlawful delivery of methamphetamine. *Id.* at 375. The defendant appealed, assigning error to the trial court's denial of his motion for a judgment of acquittal, asserting that the only evidence of his involvement in the conduct giving rise to the charges for which he was being tried was the testimony of an accomplice witness. The defendant argued that, because the accomplice's testimony was not corroborated, there was insufficient evidence to support the convictions under ORS 136.440(1). The state had argued that the accomplice's testimony *was* corroborated because the accomplice possessed methamphetamine, scales, and baggies, which "tend[ed] 'to indicate that a crime *** had taken place—*i.e.*, that someone had possessed and delivered methamphetamine to [the accomplice].'" *Id.* at

380. We concluded that that connection was insufficient to satisfy the requirement found in ORS 136.440(1) that corroborating evidence "'tend[] to connect *** [the] *defendant* with the commission of the offense[,]'" noting that, although the state had introduced evidence of the accomplice's earlier drug purchases from the defendant, that evidence failed to connect the defendant with the specific instances to which the accomplice testified and upon which the charges were based. *Ortiz-Rodriguez*, 229 Or App at 381 (emphasis in original).

This case represents the midpoint between *Ortiz-Rodriguez* and *Black*. In *Ortiz-Rodriguez*, we concluded that there was insufficient evidence to corroborate the accomplice's testimony and thus the requirement of ORS 136.440(1) was not satisfied. At the opposite end of the spectrum, in *Black*, we concluded that, although the trial court erred in not instructing the jury on the corroboration requirement, that error was harmless because there was sufficient undisputed corroborative evidence, such that even if the jury had engaged in the proper determination, based on the evidence presented, the jury could not have found that the accomplice's testimony was not corroborated.

In this case, the evidence presented at trial—the tape-recorded conversation between defendant and McKinley, defendant's testimony, and defendant's girlfriend's testimony—was not cumulative or corroborative of LM's testimony. To the contrary, much of the evidence presented relating to the events that occurred between September 2009 and November 2009—the charges of which defendant was convicted—was contradictory or equivocal with respect to LM's account of events.

LM testified that defendant provided her with hydrocodone between 2007 and late 2009. On this point, defendant's testimony directly contradicted LM's. Defendant repeatedly stated that he had never provided LM with hydrocodone in 2009. Defendant was recorded telling McKinley that he had last paid for the medications, "Um, probably the last, probably the last year and a half." This statement, made during the police investigation in approximately February 2010, could, therefore, refer to activity

occurring in 2008—*i.e.*, well before the time period upon which the charges were based. In that respect, defendant's recorded statement does not corroborate LM's testimony.

LM testified that she had met defendant once at a school book fair in September or October 2009 to receive the medications from defendant. Both defendant's and his girl-friend's testimony contradicted LM's testimony, and defendant denied providing LM with medications in 2009 at trial and on the tape recording.

According to LM, she had also met defendant once at a school volleyball game in October or November 2009, and drugs were exchanged. The testimony of both defendant and defendant's girlfriend contradicted LM's testimony. Defendant specifically addressed his recorded statements— that he "met her at [the school] one time when [he] came through late at night, she was up there for a volleyball game"—testifying that he had just listed several places that he had met LM for other purposes, and that he had not meant that he had given LM medications there.

LM testified that she had told defendant that she had lied about the cancer patient and disclosed her hydroco-done addiction to him in approximately September 2009, and, at that point, defendant had then agreed to continue to supply LM with pills, to try to gradually wean her off of them. Defendant's testimony again contradicted LM and he continued to deny giving her any medications during that year. Instead, he testified that he simply offered her advice when she told him about her addiction.

According to LM's testimony, she had traded medical services for the hydrocodone and would reimburse defendant for the pills he delivered to her. Defendant's testimony mirrored LM's testimony on the issue of payment: both testified that defendant paid for some of the medications when he first began delivering pills to LM, but more often LM reimbursed defendant when he dropped off the medications. However, defendant repeatedly denied, in testimony and on the tape recording, that he had traded medical services for drugs. Defendant testified that his remark that he had given her thousands of dollars was referring to the amount of money he had paid her for medical procedures.

"[E]vidence which merely raises a suspicion that defendant is the guilty party is not sufficiently corroborative of the testimony of an accomplice to warrant a conviction, *nor will uncertain or equivocal corroboration suffice.*" *State v. Reynolds*, 160 Or 445, 459, 86 P2d 413 (1939) (emphasis added). Here, in light of the conflicting and equivocal nature of the evidence presented, we are persuaded that the jury's verdict was likely affected by the error.

In short, had there been "substantial corroborating evidence presented at trial," then that corroboration presumably would have been evident by the number of convictions returned by the jury. That did not occur here. The evidence was closely contested and the jury returned a guilty verdict on only three of the 11 counts. The jury found defendant not guilty on one count relating to conduct in October 2009, by a margin of one vote. The jury found defendant not guilty or did not reach a verdict on the remaining seven counts, which were ultimately dismissed. Accordingly, we can infer that the jury did not accept all of LM's testimony at face value, and that it did accept at least some of defendant's contradictory testimony and evidence. Each of the three guilty verdicts was based on a jury vote of 10-2. Had the jury been properly instructed that it must determine that sufficient corroborating evidence of LM's account was presented on each count to convict defendant, it would be presumed to have undertaken that task. *Tidwell*, 259 Or App at 155-56. Accordingly, in light of the contradictory and equivocal nature of the evidence presented, we conclude that the error likely affected the jury's verdict.

Reversed and remanded.