Argued and submitted February 9, reversed and remanded May 25, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

WILLIAM MARTIN SAVAGE,
*Defendant-Appellant.*

Washington County Circuit Court
C132332CR; A156821

375 P3d 568

Morgen E. Daniels, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Before Sercombe, Presiding Judge, and Tookey, Judge, and DeHoog, Judge.

### DEHOOG, J.

After hearing the testimony of an accomplice witness, a jury convicted defendant of one count of first-degree aggravated theft, but acquitted him of one count each of second-degree robbery and first-degree burglary arising out of the same events. Defendant appeals his theft conviction and argues that the trial court erred by refusing to instruct the jury on accomplice witness testimony. At defendant's trial, his girlfriend testified that defendant had confessed to her that he had unlawfully entered and stolen property from the victim's home. Other evidence at trial suggested that the girlfriend had been an accomplice to the theft. Defendant requested jury instructions that would have told the jurors to view the girlfriend's testimony with distrust if they found that she was an accomplice and that they could not rely on her testimony alone to convict defendant, but must have other evidence corroborating defendant's guilt. The trial court declined those requests. The state concedes that the court erred in not instructing the jury as requested, and we accept that concession. However, the state contends that the error was harmless. We write to address that issue, concluding that the trial court's error in refusing to instruct the jury on accomplice witness testimony was not harmless. Accordingly, we reverse and remand.

Defendant's girlfriend, Slaughter, and the victim, Detrick, were neighbors whose backyards shared a fence. Defendant, who lived with Slaughter at her house, had interacted with Detrick. According to Detrick, he had seen defendant "probably over 100 times" at Slaughter's house in the year preceding the alleged events. Defendant and Slaughter shared a social circle, and their friends sometimes congregated at Slaughter's house. Detrick did not approve of Slaughter's lifestyle. He also had recently taken her to small claims court over a dispute concerning their shared fence.

On the day of the alleged incident, Detrick came home from work for lunch and encountered an intruder inside kneeling down and rummaging through a closet. Detrick's house had been "completely ransacked," and bags of his property appeared to be "staged" near the door, ready to be removed. Detrick described the intruder as a white

male in his thirties with a "scruffy" face and wearing a camouflage print baseball cap. The intruder pointed what appeared to be a semiautomatic pellet pistol at Detrick, who told the intruder to get out. The intruder ran out through Detrick's back door, into the backyard, into Slaughter's yard through a gap in her fence, and into her house through the back door. From Detrick's vantage point, it looked like someone inside Slaughter's house had opened the door.

Detrick immediately called 9-1-1. At that time, Detrick was unable to identify the intruder as anyone he knew. Shortly thereafter, Detrick told an investigating officer that he did not know whether the intruder had been "associated" with Slaughter, but that Slaughter had "people that live[d] there with her." Approximately two weeks later, officers showed Detrick a photo array of potential suspects; defendant's photo was included. At that time, Detrick remained unable to identify defendant as the intruder. However, after yet another two weeks—and after having learned that defendant had been arrested and charged with the theft and having seen a photo of defendant on the internet in connection with the charges—Detrick identified defendant as the intruder.

The state charged defendant with one count of first-degree aggravated theft, ORS 164.057,[1] one count of second-degree robbery, ORS 164.405, and one count of first-degree burglary, ORS 164.225. As noted, a jury convicted defendant of first-degree aggravated theft, but acquitted him of the robbery and burglary charges. The evidence supporting the jury's conviction included the testimony of two witnesses—Detrick and Slaughter—and circumstantial evidence arguably connecting defendant to the crime.

Despite his previous uncertainty about the intruder's identity, Detrick testified at trial that he was "100 percent" certain and "absolutely" and "totally positive" that defendant had been the intruder. According to Detrick, he had

---

[1] As the state charged defendant here, a person commits first-degree aggravated theft if the person, "with intent to deprive another of property or to appropriate property to the person or to a third person, *** [t]akes, appropriates, obtains or withholds such property from an owner thereof" and the total value of the property taken is $10,000 or more. ORS 164.015(1); ORS 164.055; ORS 164.057(1)(b).

thought carefully, "put two and two together," and had ultimately come to the conclusion that the intruder was "the person that [he] had seen [Slaughter] kissing." In addition, the internet photo of defendant had helped confirm Detrick's suspicions.

Slaughter also testified at trial. That testimony is the focus of this appeal. Slaughter testified that defendant had stayed with her the night before the theft; that a group of people—including defendant and, significantly, a friend named Serafin—had been at her house the morning of the burglary; that she took a nap that morning until about 11:00 a.m. or noon; and that, when she woke up to the sound of the police calling, she realized that she was alone in the house. When she met up with defendant later in the day, he told her that he and Serafin had broken into Detrick's house and stolen his property. She also testified that defendant had said that he did not think that Detrick had seen him go into Slaughter's house, because defendant had "held a gun to [Detrick] and told him to stay sitting down." Slaughter testified that she had had nothing to do with the theft and had not opened her door for defendant.

Contrary to Slaughter's testimony that she had had nothing to do with the theft, evidence at trial suggested her involvement. For example, the police found some of Detrick's stolen property at Slaughter's house and, several times during the investigation, Slaughter gave the police inaccurate or inconsistent information. She also helped defendant hide from the police. When the police kept looking for defendant at Slaughter's house, they stayed together at a friend's house for several days. Around that same time, Slaughter dyed her hair and made plans to move to Florida with defendant.

Slaughter explained that her prior actions had been misguided. According to Slaughter, she had initially tried to protect defendant because she "cared about him a lot." However, "as time went on and [she] started really thinking about *** the whole big picture and just the severity of what had happened, *** [she] didn't want to *** participate in it anymore." In closing, the state argued that, even though Slaughter "obviously *** ha[d] a bias" and

had made inconsistent statements, her trial testimony *was credible* because she had made the difficult choice to testify truthfully against defendant. To impeach Slaughter's story, defendant suggested at trial that Slaughter was now cooperating with the state only because she was afraid of being charged with the theft herself and because the police had told her that her children would be taken away from her if she did not cooperate.

Most of the other evidence connecting defendant with the charged crimes was circumstantial. That evidence included testimony from Slaughter's neighbor, Ramirez, and Ramirez's girlfriend, Stevens, who testified that, around the time that the theft occurred, Ramirez had helped defendant change his physical appearance. Ramirez was training to be a hairstylist. On the day that the theft occurred, defendant showed up at Ramirez's house, "sweating," and asked Ramirez to shave his head and face. Defendant also asked if he could put his car—a Volkswagen Touareg—in Ramirez's garage and store it there until Slaughter could pick it up. Defendant told Ramirez that his wife was trying to take the car from him. Ramirez let defendant put the car in his garage, shut the door, and proceeded to cut defendant's hair in the same garage. Serafin also was there at the time, and Stevens testified that the men "made sure that the garage door was always kept down."

Ramirez shaved defendant's "medium" length hair until he was completely "bald," and he shaved defendant's "full beard." Ramirez had never cut defendant's hair before. Ramirez thought that defendant was sweating because "he was just hot," and he did not consider the haircut to be an unusual measure or drastic transformation. Although defendant also changed his clothes at Ramirez's house, Ramirez thought that that was just because defendant "didn't want to wear his hairy clothes." The state, however, argued that defendant must have gotten the haircut in an effort to disguise his appearance.

Sergeant Schmid, who investigated the incident, provided other circumstantial evidence of defendant's involvement. He testified that, on the date of the incident, it had been raining. When he arrived at Slaughter's house in

response to Detrick's 9-1-1 call, he observed a dry spot on the driveway, suggesting that a car had been there. Later that day, when Schmid returned to continue his investigation, he found a Volkswagen Touareg in the driveway. Schmid searched the vehicle and found "burglar-type tools," "odd clothing," including gloves and a mask, and a pellet gun, which Detrick later identified as the gun that the intruder had pointed at him. When officers ultimately found defendant at a friend's house, they also found additional property there that they determined had been Detrick's. Significantly, they found a black nylon bag with the name "Detrick" on it. Finally, the state introduced text messages from defendant's phone, which indicated defendant's apparent efforts to hide from the police, including during a search of the house where he was staying.

Defendant maintained at trial that he had not committed the charged crimes. His apparent defense theory was that his was a case of mistaken identity and that Serafin or another friend with a build similar to defendant's must have committed the theft. Some circumstantial evidence at trial tended to support that theory. For example, although the police found a camouflage hat inside Slaughter's house in the course of their investigation, subsequent DNA testing of biological material found in that hat ruled out defendant as the source of the DNA, which suggested that someone else had worn the hat.

Despite that evidence in support of defendant's theory, the state argued that the evidence as a whole proved that defendant had been the intruder in Detrick's house. In closing argument, the prosecutor told the jury, "the entire case isn't hinged on Ms. Slaughter's statement that the defendant is the one that did it." Instead, the state argued, Slaughter's testimony, coupled with Detrick's eyewitness identification of defendant as the intruder and the circumstantial evidence of defendant's behavior after the theft, proved defendant's guilt.

With that background in mind, we turn to the limited issue on appeal. After the close of evidence, defendant asked the court to instruct the jury about accomplice witness testimony with respect to Slaughter's testimony.

As relevant here, the instructions requested by defendant, Uniform Criminal Jury Instructions (UCrJI) 1052, 1054, 1056, and 1057, provide as follows:

"A person aids or abets another person in the commission of a crime if the person:

"(1) With the intent to promote or make easier the commission of the crime,

"(2) Encourages, procures, advises, or assists by act or advice, the planning or commission of the crime."

UCrJI 1052.

"A witness is an accomplice witness if [he / she] could be charged with the same crime as that with which the defendant is charged. Therefore, under the circumstances of this case, [*witness's name*] is an accomplice if [he / she] could be charged with either:

"(1) Committing the crime of [*title of crime with which defendant is charged*], alleged to have been committed on or about [*date from charge*]; or

"(2) Aiding or abetting another person in committing that crime.

"To determine if [*witness's name*] could be charged with this crime, you must decide, based on the evidence received at this trial, whether there is a substantial objective basis for believing that more likely than not [*witness's name*] either committed that crime or aided and abetted another person committing the crime."

UCrJI 1054 (brackets and emphases in original).

"The testimony of an accomplice in and of itself is not sufficient to support a conviction. There must be in addition some evidence other than the testimony of an accomplice that tends to connect the defendant with the commission of the crime.

"This other evidence, or corroboration, need not be sufficient by itself to support a conviction but it must tend to show something more than just that a crime was committed. It must also connect or tend to connect the defendant with the commission of the crime."

UCrJI 1056; *see also* ORS 136.440(1) ("A conviction cannot be had upon the testimony of an accomplice unless it

is corroborated by other evidence that tends to connect the defendant with the commission of the offense.").

> "If you determine that a witness was an accomplice witness, then you should view that accomplice witness's testimony with distrust."

UCrJI 1057; *see also* ORS 10.095(4) (court must instruct jury "on all proper occasions" that "the testimony of an accomplice ought to be viewed with distrust").

Collectively, those instructions would have instructed the jury that it must determine whether Slaughter was an accomplice witness, how to make that determination, and the significance of making that determination—namely, that Slaughter's testimony was to be viewed with distrust and could not, without corroboration, be the basis for convicting defendant.

The trial court concluded, without elaboration, that the accomplice witness instructions "would [not] apply to *** Slaughter" and declined to read them to the jury. The jury voted by a count of 11 to one to convict defendant of the first-degree aggravated theft charge and acquitted him of both the robbery and burglary charges.

As noted, defendant argues on appeal that the trial court erred in declining to instruct the jury regarding accomplice testimony with respect to Slaughter's testimony. The state concedes that error, but argues that the error was harmless because other evidence "overwhelmingly demonstrated" that defendant had committed first-degree aggravated theft. We accept the state's concession that the trial court erred. Based on the evidence presented at trial, the jury could reasonably have found that Slaughter aided or abetted defendant's alleged theft from Detrick's house, and that, therefore, she was an accomplice. *See State v. Black*, 208 Or App 719, 723-24, 145 P3d 367 (2006) (accomplice witness instructions required if the record demonstrates "a substantial objective basis for believing that, more likely than not," a witness aided or abetted in the commission of an offense). However, for the reasons that follow, we disagree with the state that the trial court's error was harmless.

We must affirm a judgment notwithstanding error if the error had little likelihood of affecting the verdict and, therefore, was harmless. Or Const, Art VII (Amended), § 3; ORS 138.230; *State v. Davis*, 336 Or 19, 33-35, 77 P3d 1111 (2003). In evaluating whether an error is harmless, we review the record "in light of the error at issue." *Davis*, 336 Or at 32. We do not determine, as a factfinder, whether the defendant is guilty, weigh the evidence, or retry the case. *Id.* Instead, we evaluate, as a legal matter, the likely effect of the error on the verdict. *Id.* When a trial court has erred in refusing to give a requested jury instruction, we also consider "whether the lack of the jury instruction created an erroneous impression of the law in the minds of the [jurors that] affected the outcome of the case." *State v. Egeland*, 260 Or App 741, 746, 320 P3d 657 (2014) (internal quotation marks omitted) (citing *Waterway Terminals v. P. S. Lord*, 256 Or 361, 370, 474 P2d 309 (1970)).

The failure to instruct the jury regarding corroboration is harmless if no reasonable jury could have found that the accomplice testimony was uncorroborated—*i.e.*, the accomplice testimony was corroborated as a matter of law. *See id.* at 750 (failure to instruct on corroboration requirement is harmless error where there is "sufficient undisputed corroborative evidence, such that even if the jury had engaged in the proper determination, based on the evidence presented, the jury could not have found that the accomplice's testimony was not corroborated"). Because it is not necessary that the corroborating evidence be sufficient, by itself, to support a conviction, accomplice testimony is corroborated as a matter of law when the only reasonable inference that the jury could draw from that other evidence is that it connects or tends to connect the defendant with the commission of the charged offense. *See* ORS 136.440(1) (stating corroboration requirement). Accomplice testimony also is corroborated as a matter of law when that testimony is merely cumulative of other unchallenged evidence. *See Egeland*, 260 Or App at 750; *Black*, 208 Or App at 725 (failure to instruct on corroboration requirement was harmless error where uncontested out-of-court statement gave same account of the defendant's involvement as accomplice witness testimony).

However, where the accomplice testimony is *not* merely cumulative and not otherwise corroborated as a matter of law, we cannot conclude that the trial court's error was harmless, without improperly speculating about the jury's deliberative process. *See, e.g., Egeland,* 260 Or App at 748. For example, in *Egeland,* we concluded for that reason that the failure to instruct the jury regarding the corroboration requirement likely affected the verdict and was, thus, not harmless. *Id.* at 752. In that case, an accomplice witness testified that the defendant had illegally provided her with hydrocodone. *Id.* at 750. Because much of the ostensibly corroborating evidence in the case was contradictory or equivocal with respect to the accomplice witness's testimony, we concluded that the evidence was insufficient to corroborate that testimony as a matter of law. *Id.* We reasoned that, while there was evidence from which the jury reasonably could have found corroboration, we nonetheless could not conclude that the jury *must have* found corroboration and that, therefore, the trial court's error was harmless. *Id.* at 748. Despite that evidence, we recognized that the jury may have impermissibly relied on the accomplice's testimony alone to convict the defendant, without first determining whether it was sufficiently corroborated. *Id.* In other words, because the trial court's failure to instruct the jury regarding the corroboration requirement allowed the jury to act under an erroneous perception of the law—that it could convict the defendant solely on the basis of the accomplice's testimony—we could not conclude that there was little likelihood that the error affected the jury's verdict without speculating about how the jury viewed the evidence. *Id.* at 752.

In this case, Slaughter's testimony was not merely cumulative and not otherwise corroborated as a matter of law. As in *Egeland,* the evidence other than the accomplice testimony connecting defendant to the crime was uncertain or equivocal. If believed, Slaughter's testimony would have provided persuasive direct evidence of defendant's involvement in the alleged crimes. But, apart from her testimony, the remaining evidence connecting defendant to those crimes consisted of Detrick's eyewitness identification; defendant's association with the Volkswagen Touareg, its contents, and an item of Detrick's property; and the questions raised by

defendant's arguably suspicious conduct following the theft. None of that evidence compelled only one inference—that defendant was connected to the theft.

For example, defendant impeached Detrick's identification of him by showing Detrick's potential bias against defendant and highlighting the deficiencies of Detrick's eyewitness account.[2] Other than that equivocal direct evidence, the balance of the evidence offered as corroboration of Slaughter's account was circumstantial at best. True, those circumstances could reasonably support the inference that defendant was connected with the alleged theft, but that is not the only reasonable inference that the jury could have drawn from that evidence.[3] Accordingly, Slaughter's accomplice testimony was not corroborated by that evidence as a matter of law.

Under those circumstances, determining whether the evidence corroborated defendant's involvement remained the task of the jury. *See State v. Walton*, 311 Or 223, 243, 809 P2d 81 (1991) ("Where there is any evidence apart from that of the accomplice tending to connect the defendant with the commission of the crime, the question of whether the accomplice's testimony is corroborated is one for the trier of fact."). Here, the trial court failed to inform the jury of that task and so allowed it to act under a misperception of the law—one that would have allowed the jury to convict defendant even if it found that Slaughter's testimony was not corroborated. Especially given the trial court's refusal also to instruct the jury to view Slaughter's testimony with distrust, we cannot conclude, without speculation, that the jury did not convict defendant on the basis of that accomplice

_____

[2] As defendant argues, the fact that the jury acquitted defendant of the burglary charge suggests that the jury discredited Detrick's eyewitness identification. In that light, the remaining evidence connecting defendant to the charged crime, including Slaughter's testimony, takes on greater significance.

[3] For example, given Serafin's association with both Slaughter and the Volkswagen Touareg, together with defendant's theory that perhaps Serafin, rather than defendant, had broken into Detrick's home, the jury could have inferred that the incriminating contents of defendant's vehicle belonged to Serafin and not defendant. Similarly, because the police found Detrick's bag in a house that defendant shared with others, it is not inevitable that the jury found that defendant took it there and that it therefore tended to connect him with the theft.

testimony alone. Stated differently, we cannot say that, had the jury been properly instructed on the law, there is little likelihood that it would have reached a different verdict. As a result, the error was not harmless.[4]

Reversed and remanded.

---

[4] Given our conclusion that the failure to give the jury instructions related to corroboration was not harmless, we do not address whether the failure to instruct the jury to view Slaughter's testimony with distrust also was not harmless.