Argued and submitted February 22, affirmed June 8, petition for review denied October 20, 2022 (370 Or 404)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SACORA HORN-GARCIA,
aka Sacora Garcia, aka Sacora Horn,
*Defendant-Appellant.*

Deschutes County Circuit Court
17CR22080; A172863

513 P3d 47

Defendant was convicted of murder by abuse and first-degree criminal mistreatment in connection with the starvation death of her five-year-old stepdaughter, M. On appeal, defendant contends that the trial court committed five errors: (1) overruling a speculation objection to certain testimony by the emergency room physician who treated M on the day that she died; (2) denying defendant's motion for judgment of acquittal on the murder-by-abuse charge; (3) giving a curative instruction to the jury that murder by abuse is not a crime that is eligible for the death penalty; (4) declining to give defendant's requested jury instruction on "extreme indifference to the value of human life," as relevant to the murder-by-abuse charge; and (5) instructing the jury on nonunanimous guilty verdicts. *Held*: The trial court did not err in allowing the testimony by the emergency room physician, because the testimony was not speculative and did not imply what defendant claims that it did. The trial court did not err in denying defendant's motion for judgment of acquittal, because, viewed in the light most favorable to the state, the evidence was legally sufficient to support a conviction. The trial court did not err in giving a curative instruction on the death penalty, because the instruction was appropriate in light of statements made by defense counsel and jurors during *voir dire*, the unique nature of the death penalty, and the jury not being death-penalty qualified. The trial court did not err in declining to give defendant's "extreme indifference" instruction to the jury, because the instructions given accurately stated the law and adequately covered the points that defendant wanted made. Finally, the trial court erred in instructing the jury that it could find defendant guilty of criminal mistreatment by nonunanimous verdict, but that error was harmless because the jury returned unanimous guilty verdicts on those charges.

Affirmed.

Beth M. Bagley, Judge.

Harrison Latto argued the cause and filed the reply brief for appellant. On the opening brief was Daniel J. Casey.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, and Aoyagi, Judge, and Kistler, Senior Judge.

AOYAGI, J.

Affirmed.

**AOYAGI, J.**

Defendant was convicted of one count of murder by abuse, ORS 163.115(1)(c)(B) (2015), *amended by* Or Laws 2019, ch 634, § 28; Or Laws 2019, ch 635, § 4,[1] and one count of first-degree criminal mistreatment, ORS 163.205(1)(a), after her five-year-old stepdaughter, M, starved to death. On appeal, she raises five assignments of error. She argues that the trial court erred by (1) allowing certain testimony by an emergency room physician; (2) denying her motion for judgment of acquittal on the murder-by-abuse charge; (3) instructing the jury that murder by abuse is not a crime that is eligible for the death penalty; (4) declining to give her proposed jury instruction on "extreme indifference to the value of human life"; and (5) instructing the jury on nonunanimous guilty verdicts.[2] For the following reasons, we affirm.

## I.   BACKGROUND

This case shares background facts and arises out of the same circumstances described in *State v. Garcia*, 320 Or App 123, 512 P3d 839 (2022).

Defendant was convicted after a 15-day trial, during which numerous witnesses testified, including defendant and her codefendant Garcia, and many exhibits were admitted, including photographs, audio and video recordings, extensive text messages, and medical records. A detailed recitation of the trial evidence would serve little purpose here. Instead, we provide only a very brief overview for context.

Defendant began dating Garcia in summer 2014. At that time, defendant was living with her three daughters from a prior marriage, and Garcia was living with M, his biological niece who he had adopted as a baby. In September 2014, Garcia and M moved in with defendant and her daughters. Defendant and Garcia married in December 2014. Defendant was a "stay-at-home mom" and M's primary caregiver.

---

[1] Murder by abuse now constitutes second-degree murder, due to a 2019 statutory amendment, but its elements have not changed. *See* ORS 163.115(1)(c)(B) (2019).

[2] We list defendant's assignments of error in the order that we address them, which is slightly different from the order that they are raised in defendant's brief.

The state presented evidence that defendant and Garcia treated M differently from the other children, including withholding food from M as a form of discipline, denying M access to food, and requiring M to ask to be fed. Text messages between defendant and Garcia showed that M's eating habits and the withholding of food from her were frequent subjects of discussion. There was evidence that M would try to get food during the night and otherwise, prompting defendant and Garcia to put an alarm on M's bedroom door.

M's weight, which historically had been normal for her age (and had been on an upward trajectory), began to drop. In February 2016, at aged four, M weighed a pound less than she had 10 months earlier. In March 2016, M saw her pediatrician for a "well child" visit, and she had lost another pound. The pediatrician was concerned that M was losing weight and directed defendant to increase her caloric intake and to bring her back for a follow-up weight check. At her follow-up weight check in May 2016, M weighed 31.97 pounds, a 2.2-pound weight gain since her last visit, which confirmed that the issue was inadequate caloric intake. Defendant was told to continue giving M additional calories.

The state presented evidence that M was visibly emaciated during the summer and fall of 2016, including photographs, and that various people expressed concern about M's weight to defendant and Garcia. Although other children in the household were taken to the doctor during that period, M was never taken to the doctor again after May 2016. Meanwhile, defendant and Garcia were experiencing marital problems, and they were also adopting a baby.

According to defendant and Garcia, M had been in good health and behaving normally until approximately December 16, 2016, when M became sick with "flu-like" symptoms. She was vomiting, shaky, and tired; had a "wet cough"; was not keeping food or water down; and started to look like she had sunken cheeks. Neither defendant nor Garcia sought medical care for M.

On the morning of December 21, defendant and Garcia exchanged text messages while Garcia was at work.

During that exchange, at 8:46 a.m., Garcia asked defendant whether she would "feel scared taking [M] into urgent care," where "most likely they would just swab her nose to see if she has the flu." Defendant responded, "I don't know." Garcia responded, "To me urgent care is always less professional like there doctors are always laid back." Approximately half-hour later, at 9:19 a.m., defendant texted, "Alright, I think she def needs to go in today." Garcia responded "okay" a few minutes later. At 10:44 a.m., he added, "Might be good to go down there with all the kids to show they are healthy." At 10:47 a.m., defendant texted Garcia that he needed to come home and they needed to take her in. She then called him several times, but he did not answer. At 10.53 a.m., defendant texted Garcia that it was an "emergency" and that he needed to answer.

At 10:58 a.m., defendant called 9-1-1. She reported that M was unresponsive, almost unconscious, and possibly not breathing. She further described M as spitting up brown fluid, having stiff hands, and having open but unresponsive eyes.

First responders arrived at 11:05 a.m. They were "shocked" by M's appearance, perceived her to be "extremely underweight," and had never seen a child so underweight. One first responder described her as looking like a "rack of bones," another as "skeletal looking," and another as "very, very, very emaciated" with all of her ribs showing. M had no heartbeat, her body was fairly stiff and cold to the touch, and her skin was mottled, grayish, and purple. Because they were told that she had just gone down, and because she was a child, they tried for 17 minutes to revive her, but she showed no signs of life. They then took M to the emergency room. The emergency room doctor (Dr. Bouska) testified that M was already dead when she arrived, including showing the beginnings of *rigor mortis*. However, they tried for an hour and a half to revive her, during which she briefly regained a faint pulse, although she showed no other signs of life. M was ultimately declared dead.

At the time of her death, M was five years old and weighed 24 pounds, which is the size of a typical two- or three-year old. Given the "emaciated" and "wasted" condition

of M's body, and having ruled out all other possible medical explanations, the medical examiner concluded that M's cause of death was "emaciation," by which she meant "malnutrition or starvation." Among other things, M's autopsy revealed that M had minimal to no body fat stores and elevated levels of urea nitrogen, indicating that she had been burning muscle for energy because she was not consuming carbohydrates from food and had no body fat stores. Her internal organs also were "profound[ly]" deteriorated in size, which is something that occurs with long-term starvation, due to elevated levels of the stress hormone cortisol—and which is "absolutely not" consistent with an otherwise healthy individual getting a bad flu, as it takes "months" to occur.

Defendant was charged in connection with M's death. The thrust of her defense was that she did not know that M was not getting enough food, perceived her to be naturally thin and not abnormally so, and did not know that she was starving to death. After hearing all of the evidence, the jury found defendant guilty by unanimous verdicts of murder by abuse and two counts of first-degree criminal mistreatment. The court merged the criminal-mistreatment verdicts. Defendant was sentenced to life imprisonment with a 25-year minimum on the murder conviction and a concurrent 18-month sentence on the criminal-mistreatment conviction. Defendant appeals, raising five assignments of error.

## II.  ANALYSIS

### A.  *Dr. Bouska's Testimony*

As part of the state's case-in-chief, the jury heard testimony from Dr. Bouska, the emergency room physician who treated M on December 21, regarding M's condition when she arrived at the hospital and the efforts made to try to revive her. Most of Bouska's testimony is not at issue. However, on redirect examination, Bouska gave one answer that is the subject of defendant's first assignment of error.

At the end of redirect, the prosecutor asked, "If this patient that was on your table December 21st—if she had arrived 12 hours prior to that time, based on what you saw in front of you, is there something you could've done?" The court

overruled a "speculation" objection, which was described as being based on Bouska having "testified he can't sort of reverse-engineer a timeline based on *rigor mortis*." The court overruled the objection and instructed the witness that, if he could answer the question, he could answer. The prosecutor repeated the question as, "If [M] had been brought to the hospital sooner, the night before—is there something that you could have done in the emergency room?" Bouska answered, "To the best of my knowledge and training, I would say that the—she would have likely been alive at that time and we would've been able to evaluate for, if there was something wrong at that time, how to reverse it."

Defendant contends that the trial court erred in overruling the "speculation" objection. Specifically, she argues that Bouska's opinion that M "likely would have been alive" 12 hours earlier was speculative because Bouska admitted that he was unable to pin down M's exact time of death, which was the subject of heavy cross-examination. And she argues that the rest of Bouska's answer implied that M's condition could have been reversed and her life saved if M had only been brought in 12 hours earlier, which was both speculative and inconsistent with Bouska's other testimony.

Bouska's testimony that M "would have likely been alive" on the night of December 20 was not improperly speculative. It was based on his training and experience as an emergency room physician, information received from first responders, and his own observations of M in the emergency room. *See* OEC 702 (a witness qualified as an expert by knowledge, skill, experience, training, or education may give opinion testimony); *see also* OEC 703 (an expert may base an opinion or inference on "facts or data" that are "perceived by or made known to the expert at or before the hearing"). When pressed on his opinion that M was already dead when she arrived at the hospital, Bouska admitted to being unable to determine M's exact time of death, and he also explained in some detail that "death" is a process that can mean different things and that takes longer than most people realize. However, the fact that Bouska was unable to pin down M's precise time of death did not mean that his opinion that M was likely alive *12 hours* earlier was speculative.

Bouska explained both why he could not opine on an exact time of death and why he believed that M's death had occurred within minutes or hours before her arrival at the hospital, not days.[3]

As for Bouska's statement regarding what would have been done if M had been brought into the emergency room while she was still alive, we disagree with defendant that Bouska implied that they would have been able to reverse M's condition and save her life if only she had been brought in 12 hours earlier. Bouska had already testified on direct and cross regarding his efforts to revive M when she arrived in the emergency room on December 21, which included "checking for reversible causes," such as correctable poisoning, trauma, blood loss, or "any possible reversible cause." No reversible cause was found. In that context, Bouska's later statement on redirect—that, if M had been brought in the night before, when she was still alive, they "would've been able to evaluate for, if there was something wrong at that time, how to reverse it"—did little more than indicate that they would have followed the same procedure, *i.e.*, *evaluated* M for reversible causes. At most, Bouska's answer suggested that it would have been better to evaluate M for reversible causes while she was still alive—rather than after she had died—but did not imply that such an evaluation would have been successful in revealing a reversible cause. That is particularly so given Bouska's prior testimony that, due to her poor general state of health, M "would not be very resilient[.]"[4]

The trial court did not err in overruling the objection.

---

[3] The *exact* time of M's death was significant insofar as part of the state's theory was that defendant and Garcia had inaccurately reported the events leading up to M's death, including her physical condition on the morning of the 9-1-1 call. It would have been beneficial to the defense theory—and detracted from the prosecution theory—to establish that M died *after* defendant called 9-1-1, thus eliminating any possibility that defendant had called 9-1-1 when M was already dead and lied to cover up the timing.

[4] We note that a pediatrician reinforced the same point, testifying that "there is this point of no return in malnutrition"; that, "[i]f the patient gets too low in their weight, *** they're not going to survive, generally speaking, and [M] was certainly in that category"; and that, based on a photograph, by December 19, M's malnourishment had reached the point that it was "not survivable," that she was close to death, and that it was "very dicey" whether she could have been saved at that point.

B.  *Denial of Motion for Judgment of Acquittal (murder by abuse)*

At the conclusion of the state's case-in-chief, defendant moved for judgment of acquittal on the charge of murder by abuse. As relevant here, a person commits murder by abuse "when a person, recklessly under circumstances manifesting extreme indifference to the value of human life, causes the death of a child under 14 years of age * * *, and * * * [t]he person causes the death by neglect or maltreatment." ORS 163.115(1)(c)(B) (2015). Defendant argues that the trial court erred in denying her motion, because the evidence was legally insufficient to prove that defendant acted with "extreme indifference to the value of human life."

On review of the denial of a motion for judgment of acquittal, we examine the evidence "in the light most favorable to the state to determine whether a rational trier of fact, accepting reasonable inferences and reasonable credibility choices, could have found the essential element of the crime beyond a reasonable doubt." *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994). We have reviewed the extensive record in this case. Having done so, we conclude that the evidence, when viewed in the light most favorable to the state, was legally sufficient to allow a reasonable juror to find that defendant acted with extreme indifference to the value of human life. The trial court did not err in denying defendant's motion for judgment of acquittal.

C.  *Jury Instruction Regarding No Death Penalty*

The remaining three assignments of error pertain to jury instructions.

Murder by abuse is not a crime eligible for the death penalty. However, during the first and third *voir dire* panels for defendant's trial, defense counsel and prospective jurors discussed wrongly convicted defendants and the death penalty in a way that led the state to ask for a curative instruction that this was not a death-penalty case.

During the first *voir dire* panel—which included eight people who ended up serving on the jury—defense

counsel said, "We hear about like—who's heard like the Innocence Project? All these people who have been on death row that they now find out [they're] innocent after the fact." After a prospective juror said "yeah," defense counsel had a fairly lengthy back-and-forth with the prospective jurors about how "that can happen," during which defense counsel referred to "a lot of those poor guys that didn't have DNA"; listed poor investigation, jumping to conclusions, economics, and racism as how "that can happen"; and asked "[h]ow do we keep that from happening" that "we have all these people sort of coming off of death row, you know, that were—the highest punishment possible, and they found out they're innocent," but "juries convicted them."

A shorter but similar exchange occurred in the third *voir dire* panel, which included two people who were chosen as alternates. Defense counsel asked if "innocent people sometimes get convicte d." A prospective juror answered yes. Defense counsel asked how that happens and how to stop it. The prospective juror cited "a number of cases in recent years where people have been exonerated" by new DNA evidence. Defense counsel asked about "all those poor suckers that didn't have DNA evidence" and "[d]o you think there are people out there?" The prospective juror answered that "there are probably people who have been wrongly executed." Defense counsel then asked a different prospective juror how to "stop that from happening." That prospective juror answered, "Well, we stop the death penalty." Defense counsel clarified, "Not executed, but just convicted. How do we stop that from happening?" A prospective jury answered, "Be very aware of what true evidence is and make sure there is no doubt whatsoever."

In proposing jury instructions, the state requested an instruction that murder by abuse is not a crime eligible for the death penalty, so as to cure any misimpression that the jurors might have obtained during *voir dire*. Defendant opposed the instruction, arguing that it was enough that the jurors would receive the standard instruction not to consider the possible punishment in making their decision,

and asserting that the proposed additional instruction could prejudice her.[5]

The trial court agreed with the state that a "curative" instruction was appropriate. The court was concerned that some jurors might be unable to "render a verdict based on the law and facts" if they were under the misimpression that defendant could be sentenced to death. In the court's words, it was concerned about "a juror potentially making a decision based on a misapprehension that the death penalty could be imposed when we know there are people who would adamantly refuse to convict under those circumstances." The court pointed out that, if it were actually a death-penalty case, the jurors would be "death-penalty qualified," that is, they would have gone through a different *voir dire* process to remove anyone who could not properly perform the duties of a juror due to their personal views on the death penalty. But, in the court's words, "no one's opinions or feelings about the death penalty—because this is not a death-penalty case—were appropriately explored so that any of the attorneys would have the ability to challenge a juror who would not be able to render a verdict based on the law and facts."

The court decided to give Uniform Criminal Jury Instruction 1005, "Functions of the Court and Jury," followed by a one-sentence curative instruction:

"It is your duty to weigh the evidence calmly and dispassionately, and to decide this case on its merits. Do not allow bias, sympathy, or prejudice any place in your deliberations. Do not decide this case on guesswork, conjecture, or speculation. Do not consider what sentence might be imposed by the Court if the defendant is found guilty.

"*Under Oregon law, the charge of Murder by Abuse is not a crime that is eligible for consideration of the death penalty.*"

(Emphasis added.) There was no other mention of this not being a death-penalty case. As agreed by the parties, the

---

[5] Only defendant objected. Defendant's co-defendant, Garcia, agreed with the instruction being given for curative purposes.

trial court ordered that there be no mention of it, in closing arguments or otherwise, "other than me reading the instruction to the jury tomorrow."

Defendant contends that it was error to give the curative instruction. Specifically, she argues that it conflicts with a common-law principle, that it denied her a fair trial, and that it violated her due process rights under the Sixth and Fourteenth Amendments to the United States Constitution. In her reply brief on appeal, she adds a new argument that the instruction violated ORS 136.325.

There is a "general common-law principle" that "a jury should reach its verdict based on the facts of the case and the applicable law without being influenced by the consequences of its verdict." *State v. Amini*, 175 Or App 370, 383, 28 P3d 1204, *rev den*, 333 Or 73 (2001). Consistent with that common-law principle, ORS 136.325 provides that, with very limited exceptions, "the jury in a criminal proceeding may not be informed of, and may not consider, any punishment that the court *may impose* if the defendant is convicted of the charge." (Emphasis added.) Possibly alluding to ORS 136.325, the court noted at one point during argument on the proposed instruction that there is a difference between informing a jury of a punishment that *may* be imposed— which is prohibited—and informing it of one that may *not* be imposed.

We begin with the preserved argument. As defendant acknowledges (while disagreeing with it), under existing precedent, informing the jury of the consequences of a particular verdict does not *in and of itself* violate a defendant's due process rights under the Sixth and Fourteenth Amendments or deprive the defendant of a fair trial. *Amini*, 175 Or App at 373-75, 383-86 (where the defendant was charged with aggravated murder and raised the defense of mental disease or defect constituting insanity, it did not violate his federal due process rights that the jury was instructed at length, as provided in ORS 161.313, as to the consequences of a guilty-except-for-insanity verdict, and he was not denied a fair trial). Rather, we must evaluate the individual circumstances to determine whether the

particular information provided to the jury deprived the defendant of a fair trial in the particular case.[6]

Here, the trial court reasonably was concerned that the jurors might misapprehend that defendant could be sentenced to death if convicted—based on the jurors' interactions with defense counsel during *voir dire*—which could affect their willingness to decide the case on the law and the evidence. The unique nature of the death penalty and the strong feelings that it may arouse are precisely why jurors must be death-penalty qualified to sit on a case involving the potential imposition of the death penalty. *See State v. Turnidge (S059155)*, 359 Or 364, 407, 411, 374 P3d 853 (2016), *cert den*, 137 S Ct 665 (2017) (prospective jurors may be excused for cause in a capital case if they hold such strong ethical or moral views regarding the death penalty that it "would prevent or substantially impair" their ability to follow the court's instructions and would effectively cause the juror to vote to acquit "no matter the law or evidence in the case"); *State v. Lotches*, 331 Or 455, 478, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001) (affirming the excusal of a prospective juror because his "strong opposition to the death penalty would prevent him from following the court's instructions").

Perhaps it would have been better if the issue had been addressed during *voir dire*, as defendant suggests. It was not, however,[7] and we disagree with defendant that that was the only time that it could be addressed. If the jurors had been told during *voir dire* that this was not a death-penalty case, the connection between that information and the *voir dire* content would have been more obvious, but the

_____

[6] At times, defendant seems to argue the common-law principle separately from due process or a fair trial, but she never explains how the analysis would be different under the common-law principle or could lead to a different result than a due-process analysis. Ultimately, we understand defendant's argument to turn on whether the instruction deprived her of a fair trial, whether the underlying principle is one of common law or federal due process.

[7] In arguing against the instruction, defense counsel suggested that the state should have said something during *voir dire*, and the trial court recalled that a prosecutor did say in one *voir dire* that they should "move on" because it was not a death-penalty case. No one else remembered that, and the parties agree that no such comment was made in any *voir dire*, at least not on the record in front of the prospective jurors.

information would have been the same.[8] And that information was reasonably necessary to cure a misimpression that *voir dire* may have created. Given the nature of the death penalty and the lack of a death-penalty qualified jury, there was a legitimate risk that at least one juror might vote to acquit, despite being convinced of guilt beyond a reasonable doubt, to avoid defendant getting the death penalty. By contrast, it is highly implausible that any juror would vote to convict defendant of murdering a child, despite not being convinced beyond a reasonable doubt of her guilt, just because the death penalty was not available. In the trial court's words, given the circumstances and the instructed burden of proof, "advising [the jurors] in one sentence that the death penalty is not an issue in this case does not diminish that, minimize that, or run the risk of anything other than letting the jury know they can decide this case based on the law and the facts as they determine them to be."

By giving the instruction, the court cured the risk of an unjust and improper acquittal, without creating the risk of an unjust and improper conviction. That distinguishes this situation from the one in *State v. Wall*, 78 Or App 81, 715 P2d 96, *rev den*, 301 Or 241 (1986), a case on which defendant relies. In *Wall*, the defendant did not dispute that he had killed the victim; his defense was that he was not guilty by reason of mental disease or defect. 78 Or App at 83. During cross-examination of a psychiatrist, the prosecutor elicited testimony to the effect that a motive exists for people to want to be found not guilty by reason of mental disease or defect, because they can be confined by the state only for so long as they have an "active mental illness" and then must be released. *Id.* at 83-84. The jury subsequently found the defendant guilty. *Id.* at 85.

_____

[8] The majority of the jurors—eight of 12 seated jurors and two of three alternate jurors—had been exposed to potentially misleading *voir dire* discussions regarding the death penalty. We express no opinion on whether the outcome might be different if, for example, only one or two jurors had been exposed. At the same time, we disagree with defendant that every single juror had to be exposed for the instruction to be permissible. Jurors necessarily talk to each other during deliberations and would be unlikely to perceive it as improper to discuss *voir dire*. Moreover, it would only take one juror refusing to vote based on the evidence, due to death-penalty concerns, to change the verdict.

On appeal, the defendant in *Wall* argued that the testimony was improper and "could have influenced the jury to find him guilty in order to avoid his early release back into society, thereby depriving him of a fair trial." *Id.* at 84. We agreed that the line of questioning was improper— because "whether the defendant will be confined in a mental institution is not ordinarily a matter for the jury's consideration"—and prejudicial—because "suggesting that the state could not keep defendant confined if he were found not guilty by reason of mental disease or defect" was "very likely to have influenced the jury" by appealing to their fears and tending "to persuade them to convict rather than risk that defendant would soon be released." *Id.* at 84-85. Moreover, the general instruction given at the end of trial, not to consider what sentence might be imposed, was "too little, too late," particularly as it did not tell the jury not to consider what would happen if the defendant was found *not guilty* by reason of mental disease or defect. *Id.* at 85.

In this case, the court was trying to *prevent* the jury from relying on an improper consideration regarding the consequences of its verdict and *avert* the risk of a juror voting based on emotion rather than the evidence. The court recognized that, even with a general instruction not to consider sentencing, jurors who were not death-penalty qualified might be unable to avoid thinking about the death penalty and allow it to affect their decision. Under the circumstances, the way to cure that was to simply advise the jury that the death penalty was not at issue, to get it off their minds, while also clearly instructing the jury not to consider what sentence *might* be imposed if defendant was found guilty. Defendant was not prejudiced by the brief instruction that was given in the manner that it was given.

As for ORS 136.325, defendant did not make a statutory challenge to the instruction in the trial court, nor did she make a statutory challenge in her opening brief on appeal. Rather, defendant raises the statutory issue for the first time in her reply brief on appeal. That is simply too late. *See* ORAP 5.45(1) (we will not consider a claim of error unless it "was preserved in the lower court and is assigned

as error in the opening brief"); *Federal National Mortgage Association v. Goodrich*, 275 Or App 77, 86, 364 P3d 696 (2015) (we normally will not consider an issue raised for the first time in a reply brief). Arguing that the instruction violated ORS 136.325, even if it did not violate federal due process or deprive her of a fair trial, is a distinct new argument, based on a different source of law, that has been raised far too late, and by which defendant asks us to construe ORS 136.325—a statute as to which there appears to be no existing case law—without the state having an opportunity to brief it. We therefore do not consider defendant's belated statutory argument.

In sum, the instruction that was given was reasonably necessary to cure a potential misimpression from *voir dire* that could have improperly affected the verdict, and giving it did not deprive defendant of a fair trial. The jury was clearly instructed that it should *not* consider the sentence that might be imposed if defendant was convicted. To effectuate that instruction in these particular circumstances, it was necessary to remove from the jurors' mind the one sentence that had been discussed in *voir dire*—the death penalty—which was a sentence that could *not* be imposed and which is a sentence that is recognized as unique in our judicial system, in that jurors in a death-penalty case are not assumed to be able to follow the instruction not to consider sentencing in deciding guilt, unless they have been specifically "death-penalty qualified." Although giving such an instruction should be an exceedingly rare event, the trial court did not err in giving the instruction that it did under the circumstances that it did.

D.  *Jury Instruction Regarding "Extreme Indifference"*

To find defendant guilty of murder by abuse, the jury had to find that she recklessly under circumstances manifesting extreme indifference to the value of human life caused M's death by neglect or maltreatment. ORS 163.115(1)(c)(B) (2015). The court instructed the jury extensively on the murder-by-abuse charge, including giving the following instruction on "extreme indifference to the value of human life":

"When a crime refers to the phrase, 'recklessly under circumstances manifesting extreme indifference to the value of human life,' you must first determine that the defendant acted recklessly as defined in that jury instruction.

"Recklessness alone, however, does not establish extreme indifference to the value of human life. Rather, a person acts with an extreme indifference to the value of human life when, under the circumstances, the person's conduct demonstrates an extraordinary lack of concern that his or her actions might cause a death of a human being. *When making this determination, you must consider defendant's conduct in light of all the circumstances. You may find the defendant acted with extreme indifference to the value of human life only if the defendant's conduct revealed a great lack of concern for the risk of death to another.*"

(Emphasis added.)

Defendant had proposed an instruction that was virtually identical, except that, in lieu of the italicized sentences above, she requested:

"When making this determination you must consider defendant's conduct *before, during, and after [M]'s death* and in light of all of the circumstances. *A person can commit a gross error in judgment without being indifferent to the consequences of that error.*"

(Emphases added.)

The court declined to give defendant's proposed instruction. It considered the "error in judgment" sentence to be repetitive of other instructions, as well as potentially misleading insofar as it might suggest that gross errors in judgment can *never* demonstrate extreme indifference "when, in fact, they can under certain circumstances." As for the "before, during, and after" language, the court viewed it as not "particularly helpful or instructive to the jury." The court agreed that the jury could consider evidence of defendant's conduct before, during, and after M's death—such as her conduct at the hospital—but felt that that was already covered by the "in light of all the circumstances" instruction.[9] In the court's words, "[I]t's a long period of time. So

_____

[9]   In discussing defendant's requested instruction with the parties, the court also pointed to factual differences between this case and, for example, *State v. Downing*, 276 Or App 68, 366 P3d 1171 (2016), as making the "before, during,

what is before? What is during? What is after? And how is that more instructive than in light of all the circumstances, in light of it all?" The court also appeared to agree with the state that the jury should not be instructed that it *must* consider defendant's conduct before, during, and after M's death, as it was for the jury to decide what it considered relevant.[10]

Defendant claims error. She argues that she was entitled to her proposed instruction because it correctly stated the law, was supported by evidence, and supported her theory of the case. We review the denial of a jury-instruction request for legal error. *State v. Labossiere*, 307 Or App 560, 565, 477 P3d 1 (2020).

Generally, a defendant is entitled to a requested jury instruction "if the instruction correctly states the law and is supported by sufficient evidence in the record." *State v. Moreno*, 287 Or App 205, 209, 402 P3d 767 (2017). However, "[a] trial court does not err in refusing to give a requested instruction 'if the substance of the requested jury instruction, even if correct, was covered fully by other jury instructions given by the trial court.'" *State v. Harrison*, 292 Or App 232, 240, 423 P3d 736 (2018), *aff'd*, 365 Or 584, 450 P3d 499 (2019) (quoting *Hernandez v. Barbo Machinery Co.*, 327 Or 99, 106, 957 P2d 147 (1998)). Trial courts also should avoid giving instructions that are "reasonably capable of confusing or misleading the jury." *State v. Roberts*, 293 Or App 340, 346, 427 P3d 1130 (2018) (internal quotation marks omitted). Ultimately, we will reverse a conviction based on the refusal to give a requested jury instruction only if the instructions given "probably created an erroneous impression of the law in the minds of the [jurors] which affected

---

and after" concept less pertinent here. However, the court also expressly agreed that the jury could consider evidence of defendant's conduct before, during, and after M's death—reasoning that it was already covered by the "all" instruction, not that it was inapplicable—so we do not view those comments as especially relevant.

[10] At one point, the court offered to instruct the jury that it "*may* consider defendant's conduct before, during, and after" M's death. Defense counsel agreed that "may" was "a correct statement" of the law but asserted that "must" was "more correct" and continued to press for "must consider." The court ultimately decided not to add "before, during, and after" language, due to it not being helpful to the jury.

the outcome of the case." *State v. Thompson*, 328 Or 248, 266, 971 P2d 879, *cert den*, 527 US 1042 (1999) (internal quotation marks omitted); *see also State v. Egeland*, 260 Or App 741, 746, 320 P3d 657 (2014) (reiterating same).

Because defendant's requested instruction language derives from *State v. Downing*, 276 Or App 68, 366 P3d 1171 (2016), we begin there. In *Downing*, the trial court gave a jury instruction on the meaning of "extreme indifference to the value of human life" that included the statement, "Conduct manifesting extreme indifference to the value of human life displays indifference or a lack of concern for social or legal responsibility." *Id.* at 87. The defendant excepted to that part of the instruction, arguing that it misstated the law, as the jury was required to "specifically assess her level of concern for the value of human life, not her concern for a broader category of legal and social responsibilities." *Id.* at 79. On appeal, she similarly argued that the instruction wrongly "told the jury that it could find the element based on the mere failure to meet social and legal responsibilities," "failed to convey that the failure to meet those responsibilities must be extreme and related to the value of human life," and allowed the jury to convict her on serious charges upon a lesser culpability finding than was actually required. *Id.* at 87.

We agreed that the instruction given in *Downing* misstated the law in a way that could have affected the outcome and therefore reversed the defendant's conviction. *Id.* at 88-89. We first noted that the court never explained to the jury "that extreme indifference to the value of human life describes a state of mind about whether a person cares that the person's conduct might cause the death of another human being," nor did it explain the relationship between recklessness and extreme indifference to the value of human life. *Id.* at 88. In that context, the "social and legal responsibilities" instruction could have misled the jury to believe "that extreme indifference to the value of human life is *less* blameworthy than plain recklessness." *Id.* at 88-89 (emphasis in original). That is because conduct that is "a gross deviation from the standard of care that a reasonable person would observe in the situation"—*i.e.*, reckless—"may

be worse than conduct that merely shows 'a lack of concern for social and legal responsibility.'" *Id*. at 89. The instruction improperly "blur[red] the distinction" between recklessness and extreme indifference. *Id*. Further, as to extreme indifference, the jury was supposed "to evaluate whether defendant's actions before, during, and after the crimes revealed a great lack of concern, not just for *any* social or legal responsibility, but for the *specific* responsibility to adjust one's actions to avoid the risk of death of another." *Id*. (emphases added). "The erroneous instruction allowed the jury to convict defendant based on her disregard of a different duty." *Id*.

Correctly understood, "[e]xtreme indifference to the value of human life is a state of mind that is both *more blameworthy* than plain recklessness and that specifically relates to whether one cares about the death of another human being." *Id*. at 88. Because extreme indifference is more blameworthy than plain recklessness, a person can "commit a gross error in judgment"—*i.e.*, act recklessly— "without being indifferent to the consequences of that error." *Id*. at 89. Ultimately, the instruction in *Downing* was erroneous and prejudicial because it could have led the jury to find the defendant guilty based only on a finding of plain recklessness or dereliction of the wrong duty.

Returning to the present case, the trial court did not err in refusing to give defendant's requested instruction. With respect to the "before, during, and after [M's] death" language, we agree with the court that, although it could have added those words, it was not required to do so. The jury had heard a large amount of evidence—mostly regarding defendant's conduct before M's death, but also some regarding her conduct during and after it, such as her conduct with the first responders and at the hospital. There was no reason for the jury to believe that it could not consider all of that evidence. To the contrary, the jury was specifically instructed to consider "all" the circumstances in deciding extreme indifference, and it was also generally instructed to consider "all the evidence you find worthy of belief" in deciding the case. *See State v. Crosby*, 342 Or 419, 427, 154 P3d 97 (2007) ("[W]e read the instructions as a whole to determine

whether they state the law accurately." (Internal quotation marks omitted.)).

Instructing the jury to consider defendant's conduct "in light of all the circumstances"—without adding "before, during, and after [M]'s death"—did not create "an erroneous impression of the law in the minds of the jurors." *Egeland*, 260 Or App at 746. Defendant argues that her requested language would have served to "emphasize and clarify" that "all" circumstances included those after M's death, but we disagree that the court was required to emphasize or clarify that point. *See Harrison*, 292 Or App at 241 (concluding that trial court did not err, where it gave a legally correct instruction, in declining to give an instruction that the defendant felt would have "clarified" a point).

The court also did not err in declining to instruct the jury that "[a] person can commit a gross error in judgment without being indifferent to the consequences of that error." The jury was instructed that recklessness alone was not enough to establish extreme indifference to the value of human life; that a person's conduct must demonstrate an "extraordinary lack of concern that his or her actions might cause a death of a human being" to constitute extreme indifference; and that extreme indifference could be found only if defendant's conduct "revealed a great lack of concern for the risk of death to another." Unlike in *Downing*, the jury was properly instructed on the difference between recklessness and extreme indifference and the need for both to find defendant guilty.

The trial court is "not required to give a specifically requested instruction where it chooses to present different instructions that adequately cover the same subject." *State v. McWilliams*, 29 Or App 101, 106, 562 P2d 577, *rev den*, 279 Or 1 (1977). That is true even when, as here, the requested instruction quotes a precedential appellate opinion. As we have pointed out previously, the way that appellate opinions are written is not necessarily conducive to easy cutting and pasting of individual lines into jury instructions, and not "every quote from every opinion should become a required jury instruction." *State v. Nefstad*, 309 Or 523, 551, 789 P2d 1326 (1990); *see also Torres v. Persson*, 305 Or App 466,

477-78, 471 P3d 119 (2020) (discussing same). The point that we were making in *Downing*, 276 Or App at 88-89—that recklessness and extreme indifference do not always occur together—was well conveyed by the court's instructions and did not have to be conveyed in the exact words that we used in one sentence of *Downing. See Harrison*, 292 Or App at 241 ("The court was not required to give an instruction that was merely an enlargement on another correct and complete instruction already given.").[11]

In sum, the trial court did not err in declining to give defendant's requested instruction on extreme indifference to the value of human life.

### E.    *Jury Instruction Regarding Nonunanimous Verdicts*

The trial court correctly instructed the jury that it could find defendant guilty of murder by abuse only by unanimous verdict. However, over defendant's objection, the court instructed the jury that it could find defendant guilty of criminal mistreatment if "10 or more" jurors agreed. That instruction is the subject of defendant's final assignment of error.

Defendant is correct that it was error to give the instruction. *See Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020) (holding that, under the Sixth Amendment, a criminal defendant may be convicted of a serious offense only by unanimous verdict). However, because the jury returned unanimous guilty verdicts on the criminal mistreatment charges, the error was harmless.[12] *State v. Kincheloe*, 367 Or 335, 338-39, 478 P3d 507 (2020), *cert den*, ___ US ___, 141 S Ct 2837 (2021). We reject defendant's final assignment of error.

---

[11] Because we conclude that the court did not err in declining to give the "error in judgment" instruction, we need not address whether adding that sentence to the jury instruction might also have confused the jury as to whether a gross error in judgment can ever demonstrate an extreme indifference to the value of human life—an additional reason that the court expressed for declining to give the instruction.

[12] The court also instructed the jury that it could return nonunanimous guilty verdicts on the lesser included offenses. To the extent that aspect of the instruction is included in defendant's assignment of error, the error was harmless because the jury found defendant guilty of the greater offenses and did not return verdicts on the lesser included offenses.

### III.   CONCLUSION

Having rejected each of defendant's assignments of error for the reasons described, we affirm the judgment of conviction.

Affirmed.