No. 939 October 29, 2025 535

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

IAN MACKENZIE CRANSTON,
*Defendant-Appellant.*

Deschutes County Circuit Court
21CR47755; A180204

Beth M. Bagley, Judge.

Argued and submitted September 9, 2025.

Lindsey Burrows argued the cause for appellant. On the opening brief were Ryan T. O'Connor and O'Connor Weber, LLC. On the reply brief were Lindsey Burrows and O'Connor Weber, LLC.

Jonathan N. Schildt, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, Kamins, Judge, and Jacquot, Judge.

KAMINS, J.

Reversed and remanded.

**KAMINS, J.**

Defendant appeals from a judgment of conviction for first-degree manslaughter with a firearm, first-degree assault, and unlawful use of a weapon, entered after a jury trial. Defendant argues that the trial court erred when it refused to use his special jury instruction regarding the absence of a duty to retreat under Oregon self-defense law. We agree with defendant that, on this record, the trial court erred by not instructing the jury to that effect. Because the error was not harmless, we reverse and remand.[1]

We describe the evidence "in the light most favorable to the proponent of the instruction" to determine whether the record "supported giving the instruction." *State v. Owen*, 369 Or 288, 290, 505 P3d 953 (2022). Defendant went out for some drinks in downtown Bend with his fiancée, Butler, and his friend, Smith. Defendant had a concealed handgun license and brought a gun with him. While the three were at a bar and Butler was waiting by herself in line for drinks, she was approached by B, a man whom she did not know. B complimented her on her looks and asked her what her name was. Butler showed B her engagement ring and told him that she was not interested, and B left.

Later that evening, defendant, Butler, and Smith went outside the bar to smoke. Butler was approached by B, again, who told her that she looked beautiful and asked for her name. Butler, this time along with defendant, told B that she was not interested and to move along. B and defendant began to argue, when B, without warning, punched defendant in the head. Defendant took out a gun and yelled at B to go away. Smith tried to intervene, and B struck Smith in the face. At that point, approximately 30 seconds after the argument began, defendant fired a single, fatal shot into B's stomach. That interaction was caught on several different recordings, including a videorecording made by Butler on her cellphone.

Defendant was charged with second-degree murder, first-degree manslaughter, second-degree manslaughter,

---

[1] Our disposition obviates the need to address defendant's remaining two assignments of error.

first-degree assault, and two counts of unlawful use of a weapon, all with firearm enhancements. At trial, defendant did not dispute that he shot and killed B, but argued that he acted in self-defense or defense of others from what he reasonably believed to be an assault by B. The state, at several points during the trial, questioned why defendant did not just walk away. In response to that line of questioning, defendant, when it came time to instruct the jury, requested a special instruction stating that, under Oregon law, there is no duty to retreat before using deadly force in defense of self or others.[2] Defendant argued that the special instruction was necessary because the uniform instructions on self-defense do not mention the lack of duty to retreat, and, given the prosecutor's questions and argument, the jury could be confused about whether defendant had such a duty.

The court declined to give defendant's requested jury instruction, reasoning that the jury could consider whether defendant's decision not to retreat was reasonable, under all the circumstances, and that the requested instruction "misleads the jury into thinking that a person has no requirement to retreat." The jury found defendant guilty on all but the second-degree murder count, and this appeal followed.

"We review the denial of a jury-instruction request for legal error." *State v. Horn-Garcia*, 320 Or App 100, 117, 513 P3d 47, *rev den*, 370 Or 404 (2022). A trial court must give a jury instruction requested by a party if the instruction correctly states the law, is supported by the evidence when viewed in the light most favorable to the requesting party, and another instruction does not adequately address the issue. *State v. Ashkins*, 357 Or 642, 648, 357 P3d 490 (2015). A party is generally "entitled to have a supplemental instruction given when the existing instructions, read as a whole, do not fully cover a necessary legal point," *State v. Worsham*, 373 Or 739, 748, 571 P3d 759 (2025), but is "not entitled, in every case, to a special instruction that is tailored to the particular facts at issue." *State v. Roberts*, 293 Or App 340, 346, 427 P3d 1130 (2018). Still, a trial court

---

[2] The special jury instruction read: "Oregon law does not impose a duty to retreat before a person can use deadly force in self-defense or in defense of another person."

may err in failing to give a supplemental instruction if that instruction clarifies a word's ordinary meaning or a common misconception "imposed by our case law." *Id.* at 347. "In the end, what matters is whether the requested instruction is necessary to adequately inform the jury of the applicable law or to avoid confusing or misleading the jury." *Id.* at 346 (internal citation omitted).

Our starting point is the language of the self-defense statutes, ORS 161.209 and ORS 161.219. The physical force statute, ORS 161.209, provides that, subject to certain limitations, including the limitation in the deadly force statute, ORS 161.219,

> "a person is justified in using physical force upon another person for self-defense or to defend a third person from what the person reasonably believes to be the use or imminent use of unlawful physical force, and the person may use a degree of force which the person reasonably believes to be necessary for the purpose."

ORS 161.209. The deadly force statute, as relevant here, limits the reach of the physical force statute as follows:

> "[A] person is not justified in using deadly physical force upon another person unless the person reasonably believes that the other person is:
>
> "(1)  Committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person; or
>
> "* * * * *
>
> " (3)  Using or about to use unlawful deadly physical force against a person."

ORS 161.219. The uniform instructions given by the trial court essentially tracked that statutory language.[3]

---

[3] The trial court gave the following instructions on self-defense:

"Defenses/Physical Force/Defense of Person: The defense of self-defense or defense of another person has been raised. A person is justified in using physical force on another person to defend himself, or another, from what he reasonably believes to be the use or imminent use of unlawful physical force.

"In defending, a person may only use that degree of force which he reasonably believes to be necessary. The burden of proof is on the State to prove beyond a reasonable doubt that the defense does not apply."

As mentioned, defendant requested a special instruction, relying on *State v. Sandoval*, 342 Or 506, 156 P3d 60 (2007), that Oregon law contains no duty to retreat before using deadly force. On appeal, the parties dispute whether that is an accurate statement of the holding in *Sandoval*. Defendant also contends that the instruction was necessary to dispel the false belief, argued by the state, that defendant had some duty to retreat. The state argues that the instruction is unnecessary and fully covered by the instructions that were given, and any error is harmless.

We begin with whether the requested instruction—advising that there is no duty to retreat before the use of deadly force in self-defense—is accurate, which requires an examination of *Sandoval*. In *Sandoval*, the defendant shot and killed the victim following a driving altercation on the road. *Id.* at 508. The defendant argued that he acted in self-defense. *Id.* The state's theory was that the defendant provoked the victim, trained a rifle on him until he reached for his gun, and then shot him in the head. *Id.* At the close of trial, the court gave a series of jury instructions that were drawn from the Uniform Criminal Jury Instructions and mostly tracked the language of the self-defense statutes.[4] *Id.* at 508-09. Over

---

"Limitations/Defense of Person/Deadly Physical Force: There are certain limitations on the use of deadly physical force. The defendant is not justified in using deadly physical force on another person unless he reasonably believed that the other person was committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person or using or about to use unlawful deadly physical force against defendant or another person."

[4] Those instructions were:

"A person is justified in using physical force upon another person to defend himself from what he reasonably believes to be the use or imminent use of unlawful physical force. In defending, a person may only use that degree of force which he reasonably believes to be necessary.

"The burden of proof is on the state to prove beyond a reasonable doubt that the defendant did not act in self-defense.

"* * * * *

"There are certain limitations on the use of deadly physical force. The defendant is not justified in using deadly physical force against another person in self-defense unless he reasonably believed that the other person was using or about to use unlawful deadly physical force against him and/or committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person.

"Even in the situation where one of these threatening circumstances is present, the use of deadly physical force is justified only if it does not exceed

defendant's objection, the court then gave an additional spe-
cial instruction that the prosecution had requested:

> "The danger justifying the use of deadly force must
> be absolute, imminent, and unavoidable, and a necessity
> of taking human life must be actual, present, urgent and
> absolutely or apparently absolutely necessary. There must
> be no reasonable opportunity to escape to avoid the affray
> and there must be no other means of avoiding or declining
> the combat."

*Id.* at 509. That instruction was not based on the self-defense
statutes, but on language taken from a prior Supreme Court
opinion, *State v. Charles*, 293 Or 273, 647 P2d 897 (1982). In
*Charles*, the court held that a defendant who killed a person
in a street fight was not entitled to a jury instruction stating
that there is no duty to retreat. *Id.* at 275.

The issue before the *Sandoval* court was whether
the instruction that there must be no reasonable opportunity
to escape and no other means of avoiding the conflict accu-
rately stated the law, as it pertained to self-defense. 342 Or
at 510. Construing the self-defense statutes, the court first
observed that the deadly force statute contains no specific
reference to "retreat," "escape," "other means of avoiding" a
deadly confrontation, or some similar duty. *Id.* at 511. The
court also explained that, while the physical force statute
used the word "necessary" in the phrase, "the person may
use a degree of force which the person reasonably believes to
be necessary," that pertained only to the *degree* of force used,
and did not suggest that a decision to retreat might be "nec-
essary" in some circumstances. *Id.* (citing ORS 161.209). The
court also noted that the "imminent" requirement in that
same statute—justifying the use of physical force from what
is reasonably believed to be an "imminent use of unlawful
physical force"—pertained solely to the *timing* of the threat,
not the nature of the threatened person's response. *Id.* at
511-12 (citing ORS 161.209). The court concluded that noth-
ing in the plain text of the self-defense statutes suggested
some duty to retreat before using deadly physical force in
self-defense. *Id.* at 512 (rejecting *Charles*, 293 Or at 273).

---

the degree of force which defendant reasonably believes to be necessary in
the circumstances."

*Sandoval*, 342 Or at 509 (ellipses in original; internal quotation marks omitted).

Accordingly, the court held that "the legislature's intent [was] clear on the face of" the deadly force statute: it did not create "any additional requirement (including a requirement that there be no means of escape)" notwithstanding the requirements in the self-defense statute that the threat be imminent and the degree of force be that which the person reasonably believes to be necessary. *Id.* at 513. Thus, "[t]he legislature did *not* intend to require a person to retreat before using deadly force to defend against the imminent use of deadly physical force by another." *Id.* at 513-14 (emphasis in original).

Turning back to the requested special instruction at issue, it reads: "Oregon law does not impose a duty to retreat before a person can use deadly force in self-defense or in defense of another person." That is an accurate statement of the law, as explained by *Sandoval.*[5] There are no "additional requirement[s]," such as a duty to retreat, before using deadly force in self-defense or defense of others; there are only the requirements imposed by the plain text of the self-defense statutes.

In arguing that the instruction is inaccurate, the state points out that the instruction fails to account for those situations in which a defendant does not "reasonably perceive an imminent threat." Citing a footnote in *Sandoval*, the state argues that there could be some situations where a defendant may have a duty to retreat to avoid danger:

"If a particular danger is *not* imminent, a person who wishes to escape criminal liability may well be required to avoid the danger, rather than to seek it out and cause that danger to become imminent. *See* ORS 161.215(2) (self-defense not available if accused was initial aggressor). But the scope of the statutes that we consider here applies only to dangers that *are* 'imminent.'"

*Id.* at 512 n 2 (emphases in original).

That argument is unpersuasive for several reasons. First, defendant here was not accused of being an initial

---

[5] Although *Sandoval* involved defense of self, the self-defense statutes apply in equal force when defending another person. ORS 161.209 (statute applies "for self-defense or to defend a third person"); ORS 161.219 (statute applies to defend against reasonable belief of certain felonies or deadly force "against a person").

aggressor; indeed, the parties agreed that B was the initial aggressor of the altercation when he punched defendant. Second, far from announcing a free-standing "duty to retreat" rule in certain types of self-defense, that footnote states only that, when confronted with *non-imminent* dangers, a person might be required to avoid the danger (such as in the circumstance of an "initial aggressor").

In addition, the limitations that the state mentions were fully covered by the general self-defense jury instructions already provided, explaining that a person acts in self-defense only if they

> "reasonably believed that the other person was committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person or using or about to use unlawful deadly physical force against defendant or another person."

The proposed special instruction did not need to repeat every element of self-defense or defense of others to be correct about the absence of a duty to retreat. If the jury concluded that the state had proved beyond a reasonable doubt that defendant or Butler or Smith did not face those imminent threats from B, then the jury would follow the court's instructions and reject the defense of self-defense. *See State v. Dowd*, 342 Or App 57, 66, 575 P3d 166 (2025) (presuming that the jury follows the court's instructions). Defendant's requested instruction simply would have told the jury, correctly, that it could not use the fact that defendant did not retreat as a reason to reject the defense.

In the end, we look to the state's arguments, evidence, and jury instructions as a whole—in the light most favorable to defendant—and conclude that the special instruction was required as a matter of law. *Cf. State v. Harryman*, 277 Or App 346, 358, 371 P3d 1213, *rev den*, 360 Or 401 (2016) (trial court did not err in giving uniform instructions on self-defense and declining to give special instruction on no duty to retreat when the "defendant identifie[d] nothing in the instructions, *arguments, or evidence* suggesting that the jury would be inclined to think—erroneously—that there was a duty to retreat" (emphasis added)); *see also id.* at 358 n 8 (single statement made by prosecutor

during closing arguments that "noted both parties' failure to de-escalate the conflict" did not "interject[] the issue of whether there existed a 'duty to retreat' in the altercation that followed").

The record here shows that the state returned several times in its case-in-chief, and when cross-examining defendant, to the idea that defendant could have, or should have, retreated. The state "interject[ed] the issue" when examining Butler:

"[PROSECUTOR]:   During the time when [B] was simply—when [B] was becoming increasingly aggressive verbally, would you have felt comfortable in that situation if [defendant] had just turned and walked away and left you to deal with that situation by yourself?

"[BUTLER]:   No. I wouldn't.

"[PROSECUTOR]:   Okay."

The state also interjected the issue on its redirect of Smith, defendant's friend:

"[PROSECUTOR]:   The three of you could have jumped on [B], but you didn't. Three on one, right?

"[SMITH]:   (No audible response.)

"[PROSECUTOR]:   Fair to say?

"[SMITH]:   That could have happened. Yeah.

"[PROSECUTOR]:   That could have been one of the options, right?

"[SMITH]:   Correct.

"[PROSECUTOR]:   Could have called the police instead?

"[SMITH]   Correct.

"[PROSECUTOR]:   *Could have just grabbed [defendant] and walked away?*

"[SMITH]:   At that point, I did not want to turn my back on [B].

"[PROSECUTOR]:   Okay. *You could have backed off, yes?*

"[SMITH]:  Correct.

"[PROSECUTOR]:  Okay."

(Emphases added.)  And, the state also interjected the issue, when cross-examining defendant, by strongly implying that defendant should have retreated when the argument with B began, and that defendant should have retreated after B punched him:

"[PROSECUTOR]:  Instead of, knowing that you have a handgun, knowing that you could have been the bigger man, and turned and walked away. You didn't did you?

"[DEFENDANT]:  And leave my fiancée with this man?

"[PROSECUTOR]:  *You could have grabbed her and said, 'Hey let's go,' couldn't you have?*

"[DEFENDANT]:  Again it didn't cross my mind. It d— we d—I didn't think that it would escalate to the place that it did.

"[PROSECUTOR]:  You didn't think it was going to escalate but you are using the f words, [B] is using the f words, you think that he's flashing gang signs, Mr. Smith is starting to yell, as well and use profanities, so *you didn't think it was an option just to be the bigger person and turn and walk away*; is that correct?

"[DEFENDANT]:  No. I wouldn't say it that way, no."

(Emphases added.) During an exchange about the moments after B had punched defendant and before defendant shot B, the prosecutor again suggested that defendant should have retreated:

"[PROSECUTOR]:  So you knew the reaction of [B], he saw that you had a handgun, it fired him up even more. *But you didn't walk away did you?*

"[DEFENDANT]:  No. I—it *** scared the shit out of me that he didn't seem to care.

"[PROSECUTOR]:  Okay. *Did you grab Allison Butler, your fiancée, your beloved one and say hey let's go* this guy is crazy?

"[DEFENDANT]:  No, I did not.

"[PROSECUTOR]:  *Did you say anything to Tyler Smith like hey let's get out of here*, you know, this guy's not even paying attention to the handgun.

"[DEFENDANT]:    No * * *."

(Emphases added.) And the prosecutor reminded the jury of this line of questioning in the state's rebuttal closing argument, as part of the final argument that the jury heard before it went into deliberation:

"[PROSECUTOR]:   I asked him about 911. I did ask if they could have, you know, gang[ed] up on him. *I also said, why not just leave? Remember that?*"

(Emphasis added.) Under those circumstances, defendant's requested instruction was required. Given the emphasis that the prosecutor placed on defendant's failure to leave the situation, the jury could have believed that defendant had a duty to retreat. There was no jury instruction that "adequately address[ed] the issue" of a non-duty to retreat; thus, defendant's special instruction was required. *See Roberts*, 293 Or App at 346 (special instruction required to clear up common misconception of the law imposed by case law).

Finally, the error was not harmless. In assessing harmlessness, we look to whether "there is 'little likelihood that the error affected the verdict.'" *Ashkins*, 357 Or at 660 (quoting *State v. Hansen*, 304 Or 169, 180-81, 743 P2d 157 (1987)). In doing so, we consider "the context of the evidence and record at trial, including the parties' theories of the case." *Id.* Given that defendant did not dispute that he shot and killed B, the sole issue at trial was whether defendant was justified in using deadly force. Determination of that issue required the jury to evaluate defendant's beliefs at the time he pulled the trigger, and whether those beliefs were reasonable. The trial court's error went directly to that key issue. Without defendant's requested instruction, the jury may have—incorrectly—assumed that defendant had some duty to retreat when rejecting defendant's assertion of self-defense. Thus, there is more than a "little likelihood" that the error affected the jury's verdict.

Reversed and remanded.