Submitted February 22, affirmed June 8, 2022

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## ESTEVAN ADRIAN GARCIA,
*Defendant-Appellant.*

### Deschutes County Circuit Court
### 17CR22083; A172910

512 P3d 839

Defendant was convicted of murder by abuse and first-degree criminal mistreatment in connection with the starvation death of his five-year-old daughter, M. On appeal, defendant contends that the trial court committed five errors: (1) dismissing two manslaughter charges from the indictment before trial on the state's motion; (2) allowing a developmental and forensic pediatrician to testify regarding "scapegoat" children; (3) overruling a speculation objection to certain testimony by the emergency room physician who treated M on the day that she died; (4) denying defendant's motion for judgment of acquittal on the murder-by-abuse charge; and (5) instructing the jury on nonunanimous guilty verdicts. *Held*: The trial court did not abuse its discretion by dismissing the manslaughter charges from the indictment, because first-degree manslaughter is a lesser included offense of murder by abuse, expressly including the manslaughter charges in the indictment was therefore unnecessary verbiage, and the jury was still instructed on manslaughter as a lesser included offense of murder by abuse. The trial court did not plainly err by allowing a pediatrician to testify regarding "scapegoat" children, without intervening *sua sponte* to require the state to lay a foundation for scientific evidence, because it is not obvious and beyond dispute on this record that the foundation that was laid was insufficient; further, in these circumstances, the Court of Appeals would not exercise its discretion to correct any plain error in any event. The trial court did not err in allowing the testimony by the emergency room physician, because the testimony was not speculative and did not imply what defendant claims that it did. The trial court did not err in denying defendant's motion for judgment of acquittal, because, viewed in the light most favorable to the state, the evidence was legally sufficient to support a conviction. Finally, the trial court erred in instructing the jury that it could find defendant guilty of criminal mistreatment by nonunanimous verdict, but that error was harmless because the jury returned unanimous guilty verdicts on those charges.

Affirmed.

Beth M. Bagley, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Joshua B. Crowther, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jordan R. Silk, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, and Aoyagi, Judge, and Kistler, Senior Judge.

AOYAGI, J.

Affirmed.

**AOYAGI, J.**

Defendant was convicted of one count of murder by abuse, ORS 163.115(1)(c)(B) (2015), *amended by* Or Laws 2019, ch 634, § 28; Or Laws 2019, ch 635, § 4,[1] and one count of first-degree criminal mistreatment, ORS 163.205(1)(a), after his five-year-old daughter, M, starved to death. On appeal, he raises five assignments of error. He argues that the trial court erred by (1) dismissing two manslaughter charges before trial; (2) allowing certain testimony by a pediatrician; (3) allowing certain testimony by an emergency room physician; (4) denying defendant's motion for judgment of acquittal on the murder-by-abuse charge; and (5) instructing the jury on nonunanimous guilty verdicts. For the following reasons, we affirm.

## I.   BACKGROUND

This case shares background facts and arises out of the same circumstances described in *State v. Horn-Garcia*, 320 Or App 100, 513 P3d 47 (2022).

Defendant was convicted after a 15-day trial, during which numerous witnesses testified, including defendant and his co-defendant Horn-Garcia, and many exhibits were admitted, including photographs, audio and video recordings, extensive text messages, and medical records. A detailed recitation of the trial evidence would serve little purpose here. Instead, we provide only a very brief overview for context.

Defendant adopted M, his biological niece, in 2012 when she was a baby. In summer 2014, defendant began dating Horn-Garcia. Defendant and M moved in with Horn-Garcia and her three daughters from a prior marriage in September 2014, and defendant and Horn-Garcia married in December 2014. Defendant worked at a local grocery store to support the family, while Horn-Garcia was a "stay-at-home mom" and M's primary caregiver.

---

[1] Murder by abuse now constitutes second-degree murder, due to a 2019 statutory amendment, but its elements have not changed. *See* ORS 163.115(1)(c)(B) (2019).

The state presented evidence that defendant and Horn-Garcia treated M differently from the other children, including withholding food from M as a form of discipline, denying M access to food, and requiring M to ask to be fed. Text messages between defendant and Horn-Garcia showed that M's eating habits and the withholding of food from her were frequent subjects of discussion. There was evidence that M would try to get food during the night and otherwise, prompting defendant and Horn-Garcia to put an alarm on M's bedroom door.

M's weight, which historically had been normal for her age (and had been on an upward trajectory), began to drop. In February 2016, at aged four, M weighed a pound less than she had weighed 10 months earlier. In March 2016, M saw her pediatrician for a "well child" visit, and she had lost another pound. The pediatrician was concerned that M was losing weight and directed Horn-Garcia to increase M's caloric intake and to bring her back for a follow-up weight check. At her follow-up weight check in May 2016, M weighed 31.97 pounds, a 2.2-pound weight gain since her last visit, which confirmed that the issue was inadequate caloric intake. Horn-Garcia was told to continue giving M additional calories, and there is evidence that that information was relayed to defendant.

The state presented evidence that M was visibly emaciated during the summer and fall of 2016, including photographs, and that various people expressed concern about M's weight to defendant and Horn-Garcia. Although other children in the household were taken to the doctor during that period, M was never taken to the doctor again after May 2016. Meanwhile, defendant and Horn-Garcia were experiencing marital problems, and they were also adopting a baby.

According to defendant and Horn-Garcia, M had been in good health and behaving normally until approximately December 16, 2016, when M became sick with "flu-like" symptoms. She was vomiting, shaky, and tired; had a "wet cough"; was not keeping food or water down; and started to look like she had sunken cheeks. Neither defendant nor Horn-Garcia sought medical care for M.

On the morning of December 21, defendant and Horn-Garcia exchanged text messages while defendant was at work. During that exchange, at 8:46 a.m., defendant asked Horn-Garcia whether she would "feel scared taking [M] into urgent care," where "most likely they would just swab her nose to see if she has the flu." Horn-Garcia responded, "I don't know." Defendant responded, "To me urgent care is always less professional like there doctors are always laid back." Approximately half-hour later, at 9:19 a.m., Horn-Garcia texted defendant, "Alright, I think she def needs to go in today." Defendant responded "okay" a few minutes later. At 10:44 a.m., he added, "Might be good to go down there with all the kids to show they are healthy." At 10:47 a.m., Horn-Garcia texted defendant that he needed to come home and they needed to take her in. She then called defendant several times, but he did not answer. At 10.53 a.m., Horn-Garcia texted defendant that it was an "emergency" and that he needed to answer.

At 10:58 a.m., Horn-Garcia called 9-1-1. She reported that M was unresponsive, almost unconscious, and possibly not breathing. She further described M as spitting up brown fluid, having stiff hands, and having open but unresponsive eyes.

First responders arrived at 11:05 a.m. They were "shocked" by M's appearance, perceived her to be "extremely underweight," and had never seen a child so underweight. One first responder described her as looking like a "rack of bones," another as "skeletal looking," and another as "very, very, very emaciated" with all of her ribs showing. M had no heartbeat, her body was fairly stiff and cold to the touch, and her skin was mottled, grayish, and purple. Because they were told that she had just gone down, and because she was a child, they tried for 17 minutes to revive her, but she showed no signs of life. They then took M to the emergency room. The emergency room physician testified that M was already dead when she arrived, including showing the beginnings of *rigor mortis*. However, they tried for an hour and a half to revive her, during which she briefly regained a faint pulse, although she showed no other signs of life. M was ultimately declared dead.

At the time of her death, M was five years old and weighed 24 pounds, which is the size of a typical two- or

three-year old. Given the "emaciated" and "wasted" condition of M's body, and having ruled out all other possible medical explanations, the medical examiner concluded that M's cause of death was "emaciation," by which she meant "malnutrition or starvation." Among other things, M's autopsy revealed that M had minimal to no body fat stores and elevated levels of urea nitrogen, indicating that she had been burning muscle for energy because she was not consuming carbohydrates from food and had no body fat stores. Her internal organs also were "profound[ly]" deteriorated in size, which is something that occurs with long-term starvation, due to elevated levels of the stress hormone cortisol—and which is "absolutely not" consistent with an otherwise healthy individual getting a bad flu, as it takes "months" to occur.

Defendant was charged in connection with M's death. The thrust of his defense was that he did not know that M was not getting enough food, perceived her to be thin because she was naturally thin as well as growing, and did not know that she was starving to death. After hearing all of the evidence, the jury found defendant guilty by unanimous verdicts of murder by abuse and two counts of first-degree criminal mistreatment. The court merged the criminal-mistreatment verdicts. Defendant was sentenced to life imprisonment with a 25-year minimum on the murder conviction and a concurrent 18-month sentence on the criminal-mistreatment conviction. Defendant appeals, raising five assignments of error.

## II.   ANALYSIS

### A.   *Pretrial Dismissal of Manslaughter Charges*

Defendant's first assignment of error pertains to two charges dismissed before trial. Defendant was charged by secret indictment with five crimes: murder by abuse (Count 1); two counts of first-degree manslaughter, on different theories (Counts 2 and 3); and two counts of first-degree criminal mistreatment (Counts 4 and 5). Before trial, the state moved to dismiss Counts 2 and 3 from the indictment, because they were lesser included offenses of murder by abuse. Defendant opposed dismissal.

At a hearing on the motion, the state reiterated its request and noted that defendant had requested that the jury consider several lesser included offenses of murder by abuse, specifically first-degree manslaughter, second-degree manslaughter, and criminally negligent homicide. Defendant explained that his concern was that, if the first-degree manslaughter charges were removed from the indictment, the state might be able to suggest that defendant had "cooked up" the idea of the lesser included offenses, such as by arguing to the jury in closing that it was "ridiculous" to even consider anything less than murder by abuse. Later, defendant added an additional concern that dismissal would prejudice him in light of the "order of deliberations" jury instruction.

The trial court dismissed Counts 2 and 3, stating its reasons on the record but not in its written order. The court stated that the state was "entitled to dismiss any charges that [it did not] wish to proceed on"; that the defense was "entitled to request or not any lesser included offenses"; and that, regardless of how the charges were presented or whether the jury was given an "order of deliberations" instruction, the jury would have to decide separately whether defendant was guilty of murder by abuse and whether he was guilty of manslaughter. As for defendant's concern about closing arguments, the court deferred ruling on any issues that might arise in closing arguments. Defendant assigns error to the dismissal of Counts 2 and 3.

The trial court has discretion to dismiss criminal charges before trial. *State v. Stough*, 148 Or App 353, 355, 939 P2d 652, *rev den*, 326 Or 58 (1997) (stating also that we review for abuse of discretion). Under ORS 135.755, "[t]he court may, either of its own motion or upon the application of the district attorney, and in the furtherance of justice, order the proceedings to be dismissed,"[2] and it must set forth the reasons for the dismissal in its order. We have construed

---

[2] As to Class B and C misdemeanors, such a dismissal is "a bar to another prosecution for the same crime." ORS 135.753(2). However, if a charge or action is dismissed for purposes of consolidation with another charge or action, "such dismissal shall not be a bar to another prosecution for the same offense." ORS 135.753(3).

ORS 135.755 to apply both to dismissal of the entire accusatory instrument and to dismissal of individual charges. *Stough*, 148 Or App at 356.

As explained in *Stough*, "[t]he decision to dismiss all or part of an accusatory instrument generally involves consideration of the defendant's substantive and procedural rights in the case and the public's interest in having the law enforced." *Id*. The latter effectively constrains the court's discretion to dismiss a criminal charge. *Id*. For example, absent a constitutional violation, the "inconvenience, expense or delay caused to a defendant by the prosecution of a criminal charge is an insufficient ground to warrant dismissal." *Id*. Similarly, the trial court's perception that the state has a weak case does not allow it to dismiss the charging instrument. *State v. Swett*, 158 Or App 28, 33, 972 P2d 909, *rev den*, 328 Or 595 (1999) (pointing to the public's interest in the prosecution of crimes and the state's right to prove its case in the manner that it chooses).

The trial court was therefore incorrect in stating that the prosecution was "entitled" to dismiss any charges that it wanted. Dismissal is the court's decision, and it is to be guided by certain principles. *Stough*, 148 Or App at 356; *see also State v. Sharp*, 28 Or App 429, 432, 559 P2d 930 (1977) ("The discretion authorized by ORS 135.755 is not absolute. It is to be applied within the bounds of legal principles."). At the same time, it is notable that nearly all existing case law under ORS 135.755 involves a court's own motion, or a defense motion, not the state's motion. *E.g.*, *State v. Vasquez-Hernandez*, 159 Or App 64, 72-75, 977 P2d 400 (1999), *aff'd*, 335 Or 506, 73 P3d 291 (2003) (the court abused its discretion when it dismissed a criminal case based on the defendant's good standing in the community, his lack of significant criminal history, an arraignment delay, and post-arrest police conduct); *Stough*, 148 Or App at 356 (the court abused its discretion when it dismissed a criminal case because the defendant, who was charged with possessing a small amount of heroin, was a Vietnam veteran who became drug dependent in the war). The existing case law under ORS 135.755 sheds little light on when a court abuses

its discretion by dismissing individual charges at the state's request.[3]

    This is not the proper occasion, however, to explore the bounds of a trial court's discretion to dismiss criminal charges at the state's request. Wherever the bounds of that discretion may lie, dismissing the first-degree manslaughter charges from the indictment in these circumstances came well within them. Moreover, although the court was mistaken in saying that the state was "entitled" to dismiss the charges (to the extent that it meant that literally), it is readily apparent on this record that the court's dismissal ruling did not depend on that point, such that it would serve no purpose to remand for the court to re-exercise its discretion. Finally, even if the court had erred, it would be harmless, because the jury was still instructed on the manslaughter charges, and we disagree with defendant that the dismissal of Counts 2 and 3 was the reason for the giving of an order-of-deliberations instruction and was harmful to him.

    "[A]n indictment of one offense includes, by necessary implication, charges of lesser included offenses." *State v. Jackson*, 252 Or App 74, 75, 284 P3d 1266 (2012); *see also* ORS 136.465 ("In all cases, the defendant may be found guilty of any crime the commission of which is necessarily included in that with which the defendant is charged in the accusatory instrument."). Consequently, it is "unnecessary verbiage" to include in an indictment "the lesser included offenses derived from the offense charged." *State v. Gibbons*, 228 Or 238, 241-42, 364 P2d 611 (1961).

    Here, it is undisputed that Counts 2 and 3 (first-degree manslaughter) were lesser included offenses of Count 1 (murder by abuse). Including them in the indictment was therefore unnecessary verbiage. Dismissing Counts 2 and 3

---

[3] ORS 135.755 is also not the only statute relevant to dismissal of charges at the state's request. For example, under ORS 136.120(1), the court must dismiss the accusatory instrument if "the defendant appears at the time set for trial and the prosecuting attorney is not ready and does not show sufficient cause for postponing the trial." Such a dismissal is without prejudice as to felonies and Class A misdemeanors, unless the court orders otherwise, and is otherwise with prejudice, subject to an exception if "the court determines that dismissal is not in the public interest."

effected no change in the indictment, as defendant remained implicitly charged with the lesser included offenses. *See State v. Woodson*, 315 Or 314, 319, 845 P2d 203 (1993) (amending an indictment to charge attempted rape instead of rape did not alter the substance of the indictment, or effect a change in it, where the circumstances were such that the defendant would still be prosecuted for "the exact crime that the grand jury had in mind," and the indictment already implicitly charged attempted rape as a lesser included offense (internal quotation marks omitted)). As a result of the dismissal, the charges were simply implied rather than express. Indeed, the trial court fully instructed the jury on first-degree manslaughter, as a lesser included offense of murder by abuse.

This is not a situation in which the act of dismissal actually removed charges from the jury's consideration, either in the present trial (if dismissed without prejudice) or permanently (if dismissed with prejudice). That readily distinguishes the cases that defendant invokes as containing strong language about the seriousness of dismissal. For example, in *State v. Adams*, 86 Or App 139, 144, 738 P2d 988, *rev den*, 304 Or 405 (1987), we described dismissal as "a drastic remedy" that "is to be reserved for severe situations" and requires a "substantial" reason, but we did so in the context of reversing a trial court's dismissal of a theft complaint based on the improper conduct of private security guards. Similarly, in *State v. Hadsell*, 129 Or App 171, 174, 878 P2d 444, *rev den*, 320 Or 271 (1994), we stated that dismissal "is reserved for severe situations," but we also explained that that is because "the dismissal of a charging instrument frustrates the public interest in having the prosecution of crimes occur in order to promote the protection of the public and the rehabilitation of offenders."[4]

As for defendant's contention that the dismissal was an abuse of discretion and harmful to him because of

_____

[4] Relatedly, defendant suggests that "in the furtherance of justice" in ORS 135.755 means that a charge can never be dismissed without an extremely compelling reason. We disagree. What is in the furtherance of justice depends on the circumstances, and acting for the convenience of the court or a party may further justice, particularly when it does not negatively affect "the defendant's substantive and procedural rights" or "the public's interest in having the law enforced." *Stough*, 148 Or App at 356.

the "order of deliberations" instruction, we reject that argument. ORS 136.460(2) provides that a jury "shall first consider the charged offense," may consider a lesser included offense "[o]nly if the jury finds the defendant not guilty of the charged offense," and "shall consider the lesser included offenses in order of seriousness" when there is more than one. Consistent with that legislative directive, the court instructed the jury in this case that, when deliberating, the jury "should first consider the charged offense of Murder by Abuse"; then, only if it found defendant not guilty of murder by abuse, consider the lesser included offense of first-degree manslaughter; then, only if it found defendant not guilty of first-degree manslaughter, consider the lesser included offense of second-degree manslaughter. The court similarly instructed the jury, as to Counts 4 and 5, that it should first consider the charged offense of first-degree criminal mistreatment, then consider the lesser included offense of second-degree criminal mistreatment only if it found defendant not guilty of first-degree criminal mistreatment.

Defendant argues that, if Count 2 and 3 had remained in the indictment, the state "*might* not have been able to seek" an order-of-deliberations instruction—an instruction that "could have affected the jury's deliberations" because, by its nature, it "strong-arms jury deliberations and should be declared unconstitutional." (Emphasis added.) Defendant offers no authority for the proposition—implicit in his argument—that the "lesser included offense" portion of ORS 136.460(2) applies only to implicitly charged lesser included offenses, not expressly charged lesser included offenses. We decline to adopt that undeveloped assumption. Further, the Supreme Court has firmly rejected the argument that the instruction required by ORS 136.460(2) is unconstitutional. *See State v. Turnidge (S059155)*, 359 Or 364, 497, 374 P3d 853 (2016), *cert den*, 137 S Ct 665 (2017) (rejecting argument that the "acquittal-first" procedure created by ORS 136.460(2) is unconstitutional; "Although we recognize *** that an acquittal-first instruction places some constraint on how a jury deliberates, that constraint does not rise to the level of a violation of either the Eighth Amendment or the Due Process Clause of the Fourteenth Amendment.").

Accordingly, we reject defendant's first assignment of error, as it pertains to the dismissal of Counts 2 and 3. As for the court's failure to set forth its reasons for the dismissal in its written order as required by ORS 135.755, defendant raises that issue for the first time on appeal, without addressing the lack of preservation, and the state urges us not even to address it. In any event, any error was harmless, because the court stated its reasons on the record. *See Dept. of Human Services v. C. C.*, 253 Or App 271, 276, 290 P3d 900 (2012) (failure to include statutorily required findings in a disposition judgment was harmless error, where the information was elsewhere in the record).

B.   *Pediatrician's Testimony*

In his second assignment of error, defendant contends that the trial court plainly erred by permitting a pediatrician to testify about a "scapegoat" or "targeted" child without *sua sponte* requiring the state to lay a foundation for the testimony as scientific evidence. Because this clam of error is unpreserved, our review is limited to discretionary "plain" error review. *See* ORAP 5.45(1) (as an exception to the general appellate requirement of preservation, we have discretion to consider a "plain" error). An error is "plain" if it is an error of law, is obvious and not reasonably in dispute, and is apparent from the record without our needing to choose among competing inferences. *State v. Dilallo*, 367 Or 340, 344, 478 P3d 509 (2020); *see also State v. Gornick*, 340 Or 160, 167, 130 P3d 780 (2006) (whether an error is "plain" is a question of law). If the court committed a "plain" error, we must decide whether to exercise our discretion to correct it. *Dilallo*, 367 Or at 344.

As part of its case-in-chief, the state called a pediatrician, Dr. Cooper, to testify. We summarize the most salient parts of her testimony. Cooper has 42 years of experience in the field of developmental and forensic pediatrics. Cooper described a "developmental pediatrician" as a pediatrician who takes care of children who have developmental disabilities, have been victims of crime, have been in foster care, or have other types of behavioral problems. She described a "forensic pediatrician" as "a physician who works specifically in the area of child abuse." Cooper has seen patients "every

week" since 1976, started her own developmental and forensic pediatrics practice, has provided education and training on child maltreatment, and has written two books. Cooper sees "all types" of child abuse cases, including sexual abuse, physical abuse, neglect, and emotional abuse.

As part of her testimony, Cooper described a "scapegoat" or "targeted" child. She testified that a scapegoat child is a child who is "not treated in the same way" as other children in a group. That can include differential treatment as to food, clothing, and nurturance. Cooper has seen "many cases" of scapegoat children, including ones where a child is only allowed to eat siblings' leftovers or is excluded from family activities. She has seen a "spectrum of caloric deprivation cases" in her practice, some of which involved scapegoat children. Unlike lesser forms of caloric deprivation, which may be the result of parental ignorance, "starving" a child is "intentional," in that "you are choosing not to feed this child," especially if all the other children are well fed.

Cooper also testified regarding her review of M's case. She described evidence that M's low weight was due to inadequate caloric intake. She considered photographs of M and her family to be "profoundly significant," noting many "nice pictures" of M, but that M starts becoming visibly thinner in September 2016. Cooper pointed to a photograph from October 2016 in which M looked "clearly malnourished," whereas the other children "all appear to be well-fed." Looking at such an image, she testified, one would say that this is either a chronically ill child or a scapegoat child. Cooper noted visible signs of malnutrition in the photos. She also discussed text messages between defendant and Horn-Garcia, which, in Cooper's experience, displayed a "very common type of attitude and behavior towards a scapegoat child."

Defendant did not object to Cooper's testimony, acknowledged her as an "expert worldwide" in her field, meaningfully cross-examined her, asked questions about scapegoat children, and did not challenge the idea of scapegoat children. As previously noted, however, defendant now argues that we should reverse his convictions based on the

trial court having committed a "plain" error in failing to intervene *sua sponte* and require the state to lay a scientific foundation for Cooper's testimony regarding scapegoat children. We reject defendant's plain-error argument for two reasons.

The first is that it is not obvious and beyond dispute that Cooper's scapegoat-child testimony required a greater foundation than had already been laid. Scientific evidence is admissible if it is relevant under OEC 401, if it would assist the trier of fact under OEC 702, and if its probative value is not substantially outweighed by the danger of unfair prejudice under OEC 403. *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 301, 14 P3d 596 (2000). The proponent of scientific evidence typically must establish that it possesses "sufficient indicia of scientific validity." *State v. Southard*, 347 Or 127, 133, 218 P3d 104 (2009); *see also State v. Henley*, 363 Or 284, 307, 422 P3d 217 (2018) (scientific evidence must "possess[] the requisite level of scientific validity and reliability for admissibility under OEC 702").

What constitutes "scientific" evidence has never been "precisely defined," *State v. Marrington*, 335 Or 555, 561, 73 P3d 911 (2003), but the Supreme Court has provided guidance. "Scientific" evidence "draws its convincing force from some principle of science." *State v. Brown*, 297 Or 404, 407, 687 P2d 751 (1984); *see also Henley*, 363 Or at 302-03 (scientific evidence may be based on "hard" or "soft" sciences). Whether evidence is "scientific" in nature also "depends primarily on whether the trier of fact will perceive the evidence as such." *Marrington*, 335 Or at 561. Thus, evidence is to be considered "scientific" if it "implies a grounding in the methods and procedures of science" and if the jury will perceive it as carrying the "persuasive appeal of science." *State v. O'Key*, 321 Or 285, 292, 899 P2d 663 (1995) (internal quotation marks omitted).

In testifying regarding scapegoat children, Cooper relied almost entirely on her own experience and observations from 42 years in practice, which she repeatedly and expressly referenced. She did not testify to having received any specialized education or training on scapegoat children. She did not use a scientific-sounding word like scapegoat

"syndrome" or "phenomenon."[5] In her lengthy testimony, she made only one reference to any scientific literature, at the very end of her testimony.[6] *Compare State v. Smith*, 300 Or App 101, 105, 452 P3d 492 (2019), *rev den*, 366 Or 257 (2020) (testimony that would be "understood by the jury as a product of [the expert's] own observations and common knowledge rather than derived from scientific principles" is less likely to be scientific); *and State v. Evensen*, 298 Or App 294, 315, 447 P3d 23, *rev den*, 366 Or 64 (2019) (an investigating officer's testimony regarding child sexual abuse was not "scientific" in nature where she did not base her opinion on some "outside authoritative source" but instead testified "almost exclusively with respect to her own experience with children"); *with Marrington*, 335 Or at 563-64 (where the witness claims that "her knowledge is based on studies, research, and the literature in the field," a factfinder is likely to perceive her testimony as "scientific"); *and Henley*, 363 Or at 302 (testimony that a witness had specialized training on "grooming" through college coursework and forensic interview training "implied that its substance was authoritative and grounded in some sort of behavioral science").

Under the circumstances, even assuming that the evidence was inherently "scientific"—by virtue of Cooper's own qualifications and status as a medical doctor—it is not *obvious* and *beyond dispute* that the foundation that had already been laid was insufficient to allow Cooper to testify regarding her own experience with scapegoat children. *See Dilallo*, 367 Or at 344 (requirements for plain error). Cooper was remarkably qualified as a developmental and

---

[5] *See Henley*, 363 Or at 302 (witness's description of "grooming phenomenon" suggested that the concept existed independently of her own personal experience).

[6] Early in her testimony, Cooper mentioned that the first appearance of a scapegoat child in "literature" was a book by an author named David Pelzer, who described growing up in a family where he was called "it," which Cooper said was "a classic example of a scapegoat child." She did not say whether Pelzer used that term, and her description of the book suggests a memoir, not a scientific text. The only mention of any other literature occurred at the very end of Cooper's testimony (which spanned 140 transcript pages), in response to the second-to-last question on redirect, when Cooper mentioned an "article" in a "counseling journal" for "mental health care providers" regarding empathy deficits in siblings of scapegoat children. Cooper commented on the need to know how to treat those siblings, who are "profoundly affected" if a scapegoat child dies, and they feel partially responsible.

forensic pediatrician—defense counsel acknowledged her as a "worldwide" expert in her field—but, in discussing scape-goat children, Cooper referred almost entirely to her own experiences. Any error in the trial court not *sua sponte* intervening to require the state to lay a greater foundation for Cooper's testimony was not a "plain" error. Indeed, we note that defendant has not identified *any* case in which we have ever reversed a conviction based on a "plain" error in failing to *sua sponte* require the state to lay a greater foundation under OEC 702.

Second, even if the trial court committed a plain error, we would not exercise our discretion to reverse for plain error in these circumstances.

We correct unpreserved errors with "utmost caution," *State v. Benson*, 246 Or App 262, 267, 265 P3d 58 (2011), considering various factors, *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991). Here, if defendant had objected, the court could have easily corrected its purported error, which is a "significant factor" in deciding whether to exercise discretion on plain-error review. *State v. Inman*, 275 Or App 920, 935, 366 P3d 721 (2015), *rev den*, 359 Or 525 (2016). Moreover, the state would then have had the opportunity to address the issue that defendant now raises. Nothing suggests that, if defendant had objected, the state would have been unable to successfully address the objection and secure admission of the same testimony. In these circumstances, it would be inconsistent with the policies underlying the preservation requirement to reverse defendant's convictions when the state was never given the opportunity to respond to a challenge to Cooper's testimony. *See State v. Cambell*, 266 Or App 116, 120, 337 P3d 186 (2014) ("One of the policies underlying the preservation requirement is that of allowing the opposing party the opportunity to respond to the asserted error.").

For both reasons, we reject defendant's second assignment of error.[7]

---

[7] The state argues that defendant may have had a strategic reason not to object to Cooper's testimony, if he considered it potentially useful in trying to shift blame from him to Horn-Garcia. We need not reach that issue and express no opinion on it.

C.  *Emergency Room Physician's Testimony*

In his third assignment of error, defendant challenges the trial court's overruling of his objection to certain testimony by the emergency room physician who treated M on December 21. We reject defendant's claim of error for the same reasons that we rejected his co-defendant's similar claim of error in *Horn-Garcia*, 320 Or App at 105-07.

D.  *Denial of Motion for Judgment of Acquittal (murder by abuse)*

A person commits murder by abuse "when a person, recklessly under circumstances manifesting extreme indifference to the value of human life, causes the death of a child under 14 years of age ***, and *** [t]he person causes the death by neglect or maltreatment." ORS 163.115(1)(c)(B) (2015). In his fourth assignment of error, defendant contends that the trial court erred by denying his motion for judgment of acquittal on the murder-by-abuse charge, because the evidence was legally insufficient to prove that defendant acted with "extreme indifference to the value of human life."

On review of the denial of a motion for judgment of acquittal, we examine the evidence "in the light most favorable to the state to determine whether a rational trier of fact, accepting reasonable inferences and reasonable credibility choices, could have found the essential element of the crime beyond a reasonable doubt." *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994). Having reviewed the extensive trial record under that standard, we conclude that the evidence was legally sufficient to support defendant's conviction. The trial court did not err in denying the motion for judgment of acquittal on the murder-by-abuse charge.

E.  *Jury Instruction Regarding Nonunanimous Verdicts*

The trial court correctly instructed the jury that it could find defendant guilty of murder by abuse only by unanimous verdict. However, over defendant's objection, the court instructed the jury that it could find defendant guilty of criminal mistreatment if "10 or more" jurors agreed. That instruction is the subject of defendant's final assignment of error.

Defendant is correct that it was error to give the instruction. *See Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020) (holding that, under the Sixth Amendment, a criminal defendant may be convicted of a serious offense only by unanimous verdict). However, because the jury returned unanimous guilty verdicts on the criminal-mistreatment charges, the error was harmless.[8] *State v. Kincheloe*, 367 Or 335, 338-39, 478 P3d 507 (2020), *cert den*, ___ US ___, 141 S Ct 2837 (2021). We therefore reject the final assignment of error.

### III.   CONCLUSION

Having rejected each of defendant's assignments of error for the reasons described, we affirm the judgment of conviction.

Affirmed.

---

[8] The court also instructed the jury that it could return nonunanimous guilty verdicts on the lesser included offenses. To the extent that aspect of the instruction is included in defendant's assignment of error, the error was harmless because the jury found defendant guilty of the greater offenses and did not return verdicts on the lesser included offenses.